Royal THOMAS, et al., Plaintiffs,

v.

Marlin JOHNSTON, et al., Defendants.

Civ. A. No. A–82–CA–251.

United States District Court,
W.D. Texas,
Austin Division.

Jan. 21, 1983.

Diane Shisk, Renea Hicks, Advocacy Inc., Austin, Tex., for plaintiffs.

Martha Allen, Dept. of Mental Health and Mental Retardation, Atty. Gen., State of Tex., Ed Davis, Dept. of Human Resources, Austin, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER

NOWLIN, District Judge.

In this cause, named Plaintiffs, mentally retarded and physically disabled children who are Medicaid recipients eligible under

Texas law for placement in intermediate care facilities for the mentally retarded (ICF–MRs), challenge the reimbursement rate scheme for ICF–MRs in the State of Texas administered by the Defendants under the federally funded Medicaid program. Before the Court at this time is Plaintiffs' motion for preliminary injunction. Having carefully considered the arguments supporting Plaintiffs' motion, as well as Defendants' response thereto, and having held an evidentiary hearing with respect to the motion on June 22 and 23, 1982, the Court is of the opinion, for the reasons set out below, that Plaintiffs should be granted preliminary injunctive relief. Because of the complexity of the issues raised by Plaintiffs, and because the Court's basis for entering this preliminary injunction is considerably narrower than the broad-based arguments presented to the Court in support of the motion, a somewhat detailed explanation is required of the issues raised by the parties and the Court's analysis and resolution of some of those issues.

## I.

## INTRODUCTION

A. *The Parties*

Each of the named Plaintiffs is a Medicaid recipient eligible under Texas law for ICF–MR placement in a Level V facility. Each is mentally retarded, physically disabled, and has behavioral problems. Each has been professionally evaluated and has an individual habilitation plan developed in conformity with federal regulations.

Named Plaintiffs are six of fourteen ICF–MR residents of Ada Wilson Hospital who were notified in January of 1982 by hospital authorities that they would be discharged from the hospital at the end of May of 1982 due to staff cutbacks resulting from a reduction in Ada Wilson's rate of reimbursement for their care. This reduction in reimbursement resulted from a change in the Texas ICF–MR reimbursement rate structure that became effective

December 1, 1981. Named Plaintiffs have resided in Ada Wilson Hospital for periods of time ranging from one and a half to four years.

Ada Wilson Hospital's ICF–MR is a licensed Level V, non-profit children's facility, admitting ages 6 to 17. The hospital opened its ICF–MR facility in November of 1977, and is one of only two community based ICF–MR Level V facilities serving children in Texas. Ada Wilson Hospital has seventy-two ICF–MR residents, sixty-five of whom are multiply handicapped. These children require a wide range of services in differing amounts, depending upon their individual habilitation plans.

Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.,* commonly known as the Medicaid Act, establishes a cooperative relationship between the federal government and state governments designed to share the cost of medical services to needy individuals with limited incomes and resources. If a state elects to participate in the Medicaid program, it must designate "a single state agency to administer or to supervise the administration of the [state Medicaid] plan." 42 U.S.C. § 1396a(a)(5). The designated state agency then draws up a medical assistance plan consistent with the guidelines contained in the Medicaid Act and the regulations promulgated thereunder and submits it to the Health Care Financing Administration (HCFA), an agency of the Department of Health and Human Services (HHS) for approval. When HCFA approves the plan, the state becomes eligible for federal matching funds for reimbursement of the cost of specific types of medical assistance, 42 U.S.C. § 1396b(a).

Intermediate Care Facilities for the Mentally Retarded (ICF–MRs) are residential facilities providing twenty-four hour care, habilitative services and supervision to persons who are mentally retarded or have related conditions and require an institutional-type setting to benefit from active treatment.[1] *See* 42 U.S.C. §§ 1396a(c), (d);

---

1. An institution may be certified as an ICF–MR only if its Medicaid residents are receiving ac-

tive treatment.   42 U.S.C. §§ 1396d(c), (d);  42

42 C.F.R. § 435.1009; 42 C.F.R. § 442.400 *et seq.* The ICF–MR program is one that a state may elect to provide as an optional medical service to its Medicaid-eligible population and receive federal financial assistance under the terms of the Medicaid Act. 42 U.S.C. § 1396d(a)(15).

Texas elected to participate in the Medicaid ICF–MR program beginning in 1976. Defendant Texas Department of Human Resources (TDHR) is the single state agency designated pursuant to 42 U.S.C. § 1396a(a)(5) to administer the Medicaid program in the state of Texas. TDHR contracts with Ada Wilson Hospital and other ICF–MRs to provide covered services to Medicaid recipients such as Plaintiffs. TDHR has overall responsibility for administering the Medicaid program in Texas, including the determination of rates at which ICF–MRs will be reimbursed for providing such services. Defendant Marlin W. Johnston is Commissioner of TDHR and is sued in his official capacity. As Commissioner he is charged with overall responsibility for the administration of TDHR, including the state Medicaid program.

Defendant Texas Department of Mental Health and Mental Retardation (TDMHMR) is the agency of the State of Texas charged with administering state facilities for the mentally retarded, and shares certain responsibilities with TDHR and the Texas Department of Health for the State ICF–MR program. Defendant Gary Miller is the Commissioner of TDMHMR and is sued in his official capacity. As Commissioner he is the chief administrative officer of TDMHMR and has general responsibility for administration of the Department and its institutions and programs.

## B. The Medicaid Act and the Texas Scheme for ICF–MR Reimbursement

Initially, the Medicaid Act did not include any specific requirements concerning the methods of reimbursement to be used to pay for ICF–MR services. Individual states were allowed to develop their own payment methods, subject only to the general requirement of 42 U.S.C. § 1396a(a)(30) that payments not exceed reasonable charges consistent with efficiency, economy, and quality of care. Thus, states developed a variety of payment methods ranging from the retrospective, reasonable cost reimbursement system used by Medicare, *see* 42 C.F.R. Part 405, Subpart D, to prospective rates based upon factors not necessarily di-

C.F.R. § 440.150(c). Active treatment in ICF–MRs requires the following:

(a) The individual's regular participation, in accordance with an individual plan of care, in professionally developed and supervised activities, experiences, or therapies.

(b) An individual written plan of care that sets forth measurable goals or objectives stated in terms of desirable behavior and that prescribes an integrated program of activities, experiences or therapies necessary for the individual to reach those goals or objectives. The overall purpose of the plan is to help the individual function at the greatest physical, intellectual, social, or vocational level he can presently or potentially achieve.

(c) An interdisciplinary professional evaluation that—

\*    \*    \*    \*    \*    \*

(2) Consists of complete medical, social, and psychological diagnosis and evaluations and an evaluation of the individual's need for institutional care; and

(3) Is made by a physician, a social worker and other professionals. . . .

(d) Reevaluation medically, socially, and psychologically at least annually by the staff involved in carrying out the resident's individual plan of care. . . .

(e) An individual postinstitutionalization plan, as part of the individual plan of care, developed before discharge. . . .

42 C.F.R. § 435.1009.

In addition, in order to meet the requirements for "active treatment" and to be certified to participate in Medicaid, an ICF–MR provider must provide a wide array of services under federal regulations, including health and hygiene training; habilitation and training programs; physical and occupational therapy services; recreation and social services; speech pathology and audiology services; psychological services; medical, nursing, dental and pharmacy services; and food and nutrition services. *See* 42 C.F.R. Chapter 442 and 42 C.F.R. § 435.1009. Provision of these services to residents is based upon the resident's individual needs. ICF–MR providers must also meet prescribed staffing requirements, comply with a resident's bill of rights, and conform to health and safety standards.

rectly related to actual facility costs, including state budgetary considerations.[2]

In 1972, Congress added a new section to the Social Security Act, 42 U.S.C. § 1396a(a)(13)(E), effective July 1, 1976. This section required that each state Medicaid plan provide for reimbursement of intermediate care facility services

on a *reasonable cost related basis,* as determined in accordance with methods and standards which shall be developed by the State on the basis of cost-finding methods approved and verified by the Secretary[.]

Social Security Amendments of 1972, Pub.L. No. 92–603, § 249 (amended 1980) (emphasis added).

The Senate Finance Committee report accompanying this amendment stated that under the previous statutory standard, some skilled nursing facilities and intermediate care facilities were being overpaid while others were being paid too little to support the quality of care needed by Medicaid patients. The Committee noted, on the other hand, that the reasonable cost reimbursement method used by Medicare and, in particular, the detailed cost-finding requirements that are an integral part of that method, could cause difficulty for some long-term care facilities. The amendment required that payments to long-term care facilities be related to the reasonable costs the facilities incur, thus permitting states considerable flexibility, within limits established by HCFA regulations, to develop their own methods and standards for paying these costs.

The Omnibus Reconciliation Act of 1980 (Pub.L. 96–499), enacted on December 5, 1980 and effective October 1, 1980, made a significant change in the provisions of the Medicaid law that govern payments for long-term care facilities, including ICF–MRs. Section 962 of Pub.L. 96–499 amended section 1902(a)(13)(E) of the Medicaid Act to remove the requirement that states pay for these services on a reasonable cost-related basis, and substituted for it a new statutory standard requiring that intermediate care facilities be paid through the use of rates, determined in accordance with methods and standards developed by the state,

which the State finds, and makes assurances satisfactory to the Secretary, are *reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities* in order to provide care and services in conformity with applicable State and Federal laws, regulations and quality and safety standards....

42 U.S.C. § 1396a(a)(13)(A) (Supp.1982) (emphasis added).

The legislative history of this 1980 amendment sheds light upon the reasons for its adoption and Congress' intent concerning how the new statutory standard should be carried out. The Senate Report accompanying the amendment stated:

States have argued that the complex and long-delayed Federal regulations implementing [the reasonable cost-related basis statutory standard] have unduly restrained their administrative and fiscal discretion and that the federal approval process has forced States to rely heavily on medicare principles of reimbursement. Neither of these consequences was intended when [that statutory standard was enacted].

The committee continues to believe that states should have flexibility in developing methods of payment for their medicaid programs and that application of the reasonable cost reimbursement principles of the medicare program for long-term care facility services is not entirely satisfactory. These principles are inherently inflationary and contain no incentives for efficient performance.

The committee bill deletes the present language of [42 U.S.C. § 1396a(a)(13)(E)]

---

**2.** An excellent description of the changes that the basic statutory standard for reimbursement of ICF–MRs and other long-term care facilities has undergone since the inception of the Medicaid program, as well as a summary of the effect that these changes have engendered in state programs for reimbursement, may be found at 46 Fed.Reg. 47964–47973 (1981). This Court's outline of these changes draws heavily upon that source.

and substitutes language which gives the States flexibility and discretion, subject to the statutory requirements of this section [and other statutory requirements], to formulate their own methods and standards of payment.

Under the bill, States would be free to establish rates on a statewide or other geographic basis, a class basis, or an institution-by-institution basis, without reference to medicare principles of reimbursement. The flexibility given the states is not intended to encourage arbitrary reductions in payment that would adversely affect the quality of care. Under the bill, the State would be required to find, and make assurances satisfactory to the Secretary, that the payment rates, taking into account projected economic conditions during the period for which the rates are set, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and standards. The State would also be required to assure the Secretary that it has provided for the filing by the facilities of uniform cost reports and for their periodic audit by the State.

The Congress expects that the Secretary will keep regulatory and other requirements to that minimum necessary to assure proper accountability, and not to overburden the States and facilities with marginal but massive paperwork requirements. It is expected that the assurances made by the States will be considered satisfactory in the absence of a formal finding to the contrary by the Secretary.

\*     \*     \*     \*     \*     \*

S.Rep. No. 96–471, 96th Cong., 2d Sess., *reprinted in* 4 Medicare and Medicaid Guide ¶ 24,407, at 8780–81 (CCH) (1981).

The Conference Report accompanying the 1980 amendment stated:

The conference agreement follows the Senate amendment with a modification to clarify that, while the States have discretion to develop the methods and stan-

dards on which the rates of reimbursement are based, the Secretary retains final authority to review the rates and to disapprove those rates if they do not meet the requirements of the statute. The conferees intend that the Secretary exercise this review in a timely fashion.... The conferees would further note their intent that a State not develop rates under this section solely on the basis of budgetary appropriations. In determining whether the rates proposed by a State are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities, the Secretary is not expected to approve a rate lower than the applicable legal requirements would mandate.

H.Conf.Rep. No. 96–1479, 96th Cong., 2d Sess. 154, *reprinted in* [1980] U.S.Code Cong. & Ad.News 5526, 5594.

The Department of Health and Human Services subsequently promulgated regulations implementing the new federal statutory standard. *See* 42 C.F.R. §§ 447.250 to .272. The above-described change in the federal reimbursement standard in no way altered federal substantive standards relating to the amount and quality of care that ICF–MR facilities must provide.

From June of 1976 to December of 1978, the Texas ICF–MR reimbursement rate structure was based upon payment of uniform statewide rates that varied depending upon the "level of care" of residents served by ICF–MR providers. Three levels of ICF–MR care were established, denominated as Levels I, V and VI and covering all ICF–MR residents in the state. Level I is for individuals who are mildly retarded or developmentally disabled, ambulatory, and require a minimal amount of care and supervision. Level V is for individuals with mild to profound levels of mental retardation or related developmental disabilities needing daily supervision and developmental services. Level VI is for severely and profoundly mentally retarded or developmentally disabled persons who require continuous supervision and services in a highly structured setting. Because a wide range

of disabilities is covered by each level of care, the conditions and needs of ICF–MR residents in any particular level of care may vary substantially, and the costs of providing for those needs also may vary. State schools and state centers generally provide all three levels of care within one facility. Community based ICF–MRs are certified to provide a single level of care.

In January of 1979, in an attempt to encourage expansion of the private ICF–MR program, TDHR altered its previous reimbursement rate structure by eliminating the system of payment of uniform statewide rates depending upon level of care and substituting for it a "facility-by-facility" reimbursement scheme based upon a retrospective determination of actual costs incurred by Texas ICF–MR providers. Between 1979 and 1981, program costs under the facility-by-facility scheme increased at a rate substantially in excess of the rate of inflation. TDHR experienced ICF–MR budget deficits that were overcome only by transferring funds from other programs.

Believing that the facility-by-facility scheme provided no adequate mechanism for cost containment, and having determined that the rising cost of the ICF–MR program endangered the program's very existence in Texas, TDHR began considering the adoption of a new reimbursement rate structure. By the Spring of 1980, TDHR was considering implementing a uniform reimbursement rate scheme. In the Fall of 1980, TDHR published a proposed uniform rate structure in the Texas register and conducted public hearings. Implementation of the proposed uniform rate scheme was delayed, however, until the Summer of 1981, when an amended version of the proposed scheme was published in the June 16, 1981 Texas Register and later adopted, with some changes, and published in the August 18, 1981 Texas Register. Implementation of the new plan was further delayed by a lawsuit in federal court in the Southern District of Texas in which the district judge entered a preliminary injunction restraining TDHR from implementing the new reimbursement rate structure prior to formal written approval by HCFA. On November 20, 1981, HCFA approved the new plan, and the new rates became effective December 1, 1981. The current reimbursement rate structure, along with the TDHR rules concerning allowable and unallowable costs, are set out in Part I of Appendix A of this opinion.

The central feature of the current reimbursement rate structure is its use of uniform statewide payment rates depending upon level of care and provider classification. The rate structure distinguishes between two provider classes: (1) state schools for the mentally retarded and state centers for human development, and (2) community based providers. Both of these provider classifications are then subdivided into the three levels of ICF–MR care—Levels I, V and VI—established under the original reimbursement rate structure. Thus, six categories are established, each with a separate uniform rate of reimbursement.

Rates for each category are determined based upon previous year costs as reported by providers. These cost reports are subjected to a desk verification, including the adjustment of reported costs to remove any unallowable costs that may be reported. Detailed restrictions on allowable and unallowable costs are set out in the TDHR rules published in the November 3, 1978 volume of the Texas Register and appear in Part II of Appendix A of this opinion. Within each level of care, after unallowable costs are removed and certain adjustments to reported costs are made, per diem costs are divided into four projected cost areas: (1) patient care costs; (2) dietary costs; (3) facility costs; and (4) administrative costs. The per diem costs within each of these four cost areas are then rank-ordered from low to high.

After unallowable costs are removed and the costs in each cost area are arrayed from low to high, the final rate for each category is set by selecting the projected per diem expense from each cost area which corresponds to the 60th percentile Medicaid day of service, and summing the amounts of the four cost areas to arrive at a per diem

reimbursement rate. Because a number of costs included in the raw data base were excluded as unallowable based on TDHR's determination that they were excessive, the calculation of the 60th percentile Medicaid day of service based upon the refined data base resulted in a reimbursement rate equivalent to the cost of the 40th percentile Medicaid day of service of the raw data base. How and why TDHR made the decision to set reimbursement rates at, in effect, the 40th percentile level is one of the central issues in this case and will be discussed more fully below.

Under the new reimbursement rate structure, the current rates of reimbursement for ICF–MR care at Levels V and VI are as follows:

|  | State School | Community Based |
| --- | --- | --- |
| ICF–MR V | $56.95 | $39.51 |
| ICF–MR VI | $62.56 | $44.88 |

The state school rate includes an ancillary cost of approximately $5 per day to reimburse for additional medical expenses borne by the state schools.

Ada Wilson Hospital's reimbursement rate for its first year of operation was $28.39 per Medicaid patient day. With the facility-by-facility scheme in 1979, the rate changed to $46.67 for fiscal year (FY) 1979, $49.38 for FY 1981, and $52.72 for the months of September through November of 1981. The change to a uniform reimbursement rate scheme, effective December 1, 1981, resulted in a reduction in the reimbursement rate for Ada Wilson from $52.72 to $39.51, or a $29,010.00 per month reduction for the 72 children served at the facility.

C. *The Issues*

On May 14, 1982, five named Plaintiffs— Royal Thomas, Bradley Depuy, Scott Szust, Tracy Martin, and Brandon Knute Ostrum—by and through their parents, filed a complaint in this Court challenging the current Texas ICF–MR reimbursement rate structure as violative of state and federal law and seeking preliminary and permanent injunctive and declaratory relief invalidating the current rate structure, requiring that it be revised to conform to applicable federal law, and immediately reinstituting the previous reimbursement rate structure until such time as the rate structure is revised to conform to applicable law.

Named Plaintiffs sought to bring the action on their own behalf and, pursuant to Fed.R.Civ.P. 23(a) and 23(b)(2), on behalf of all others similarly situated.[3]

On May 20, 1982, Plaintiffs applied for a temporary restraining order enjoining Defendants from continuing to reimburse Ada Wilson Hospital at the rate of $39.51 per Medicaid patient day and requiring Defendants to return to the prior rate of $52.72 per Medicaid day for Plaintiffs and nine other residents of Ada Wilson Hospital scheduled to be discharged by the hospital on May 31, 1982. The application for TRO was supported by an affidavit of John Dean, Administrator of Ada Wilson Hospital. According to this affidavit, the hospital had scheduled for discharge on May 31, 1982 a group of fourteen children, including the five named Plaintiffs; these fourteen children were selected for discharge because they are very active and require more supervision and services to deal with their behavior than other residents of the hospital. The affidavit stated that although the hospital had made staff cuts in response to the reduction of its reimbursement rate

---

**3.** Specifically, Plaintiffs seek to represent a class composed of: (1) all Medicaid recipients in the State of Texas who are residing in ICF–MRs Level V and VI and receiving less than the quality of care mandated by federal and state law; (2) all Medicaid recipients in the State of Texas who are residing in ICF–MRs Level V and VI and who will be discharged from ICF–MRs Level V and VI because their residential facility will be unable to provide the quality of care they require as a result of the change in the reimbursement rate structure adopted by Defendants; and (3) all Medicaid-eligible individuals in the State of Texas who are eligible for ICF–MR Level V or VI community based placement but have been unable to secure such services because these facilities are unable to provide the quality of care these individuals require as a result of the change in the reimbursement rate structure adopted by Defendants.

brought about by implementation of the new ICF–MR reimbursement rate structure, additional reductions in the hospital's direct care staff would have to be made on June 1, 1982 in order to bring the hospital's expenses down to the level of the new reimbursement rate, resulting in a situation in which the hospital could no longer provide the fourteen children with necessary services. The affidavit further stated that upon discharge of the fourteen children, their beds eventually would be filled by other persons whose needs for staff supervision and services are less than the children discharged. Finally, Mr. Dean's affidavit stated that in his opinion the hospital was currently operating in the most efficient and economical manner possible consistent with providing quality care for its residents, and that it was experiencing losses of $15,-000 per month under the new reimbursement rate structure.

Also attached to Plaintiffs' application for TRO was an affidavit of Jan Ackerman, mother of named Plaintiff Scott Szust. In her affidavit, Ms. Ackerman stated that she had been notified by Ada Wilson Hospital that Scott would be discharged the last week in May of 1982 due to cutbacks in funding of the hospital and the hospital's subsequent inability safely to take care of Scott. She stated that since being notified of the planned discharge she had worked to find an alternate placement for Scott, but that her efforts had been unsuccessful. She stated that she had visited the Corpus Christi State School, and that based upon her own observations of the children there, placement in that state school would be harmful to Scott and that he would not get the supervision he needs. Finally, she said that she was unable to care for Scott herself and that, for her own sake, she would not pick him up on the day of his discharge from Ada Wilson.

Based upon a review of Plaintiffs' complaint and application for TRO along with the supporting affidavits, and after hearing Defendants' informal response to Plaintiffs'

TRO application, the Court issued a temporary restraining order on May 21, 1982, enjoining Defendants from continuing to reimburse the hospital for care and services provided to the fourteen children scheduled to be discharged on May 31, 1982 at the current rate of $39.51 per Medicaid patient day and requiring Defendants to return to the previous reimbursement rate of $52.72 per Medicaid patient day pending a decision on the preliminary injunction. On May 28, 1982, the Court, on its own motion, extended the TRO for ten days and set the hearing on Plaintiffs' motion for preliminary injunction for June 3, 1982. On June 2, 1982, Plaintiffs filed an amended complaint naming an additional Plaintiff, Curtis Lindsey, and citing additional causes of action against Defendants. By agreement of the parties, the Court entered an order on June 7, 1982 continuing the hearing on the motion for preliminary injunction until June 22, 1982, and extending the TRO until the time of the hearing.

On June 22, 1982, the Court held an evidentiary hearing on Plaintiffs' motion for temporary injunction. At the hearing, the parties agreed to continue the TRO in effect until the time of the Court's ruling on the motion for preliminary injunction.

Plaintiffs' amended complaint, as explained and amplified by Plaintiffs' briefs and their arguments at the hearing, states nine separate claims against Defendants, seven arising out of federal law and two grounded in state law. Five of these claims are based upon alleged violations of various sections of the Medicaid Act and 42 U.S.C. § 1983; one is based upon alleged violation of the Fourteenth Amendment and 42 U.S.C. § 1983. The remaining federal claim is based upon alleged violation of Section 504 of the Rehabilitation Act of 1973. The two state claims arise from alleged violations of the Texas Mentally Retarded Persons Act and a TDHR Rule.

First, Plaintiffs claim that the current Texas reimbursement rate structure violates 42 U.S.C. § 1396a(a)(13)(A)[4] and

4. 42 U.S.C. § 1396a(a)(13) provides, in pertinent part, that a State plan for medical assistance must—

(13) provide—

therefore 42 U.S.C. § 1983 because the rates of reimbursement for ICF–MR services are set so low that they are not reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care for Plaintiffs and their class in conformity with applicable state and federal laws, regulations, and quality and safety standards. Plaintiffs further argue that the *manner* in which Texas ICF–MR reimbursement rates were set by Defendants was arbitrary, capricious and inconsistent with the basic federal reimbursement standard and the regulations promulgated thereunder. Among the arguments Plaintiffs make with respect to this claim is that Defendants violated the statute and 42 C.F.R. § 447.252(b)[5] by failing to make a proper finding, after consideration of all

relevant factors, that the rates are in fact reasonable and adequate to meet the costs necessarily incurred by efficiently and economically operated facilities.

Second, Plaintiffs claim that the current reimbursement rate structure violates 42 U.S.C. §§ 1396a(a)(17)[6] & (30)[7] and therefore 42 U.S.C. § 1983 because it results in rates that are inadequate to provide a reasonable standard of medical assistance to Plaintiffs consistent with quality and care and with the other objectives of the Medicaid Act. Third, Plaintiffs claim that the reimbursement rate structure violates 42 U.S.C. § 1396a(a)(23),[8] 42 C.F.R. § 447.204[9] and therefore 42 U.S.C. § 1983 because, by failing to provide adequate reimbursement to community based ICF–MR facilities, it thereby violates Plaintiffs' right to obtain medical assistance from any institution

(A) for payment ... of the ... intermediate care facility services provided under the plan through the use of rates (determined in accordance with methods and standards developed by the State) and ... which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards....

5. 42 C.F.R. § 447.252 provides, in pertinent part:

(a) *Payment rates.* (1) The Medicaid agency must pay for inpatient hospital services and long-term care facility services through the use of rates that are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers to provide services in conformity with applicable State and Federal laws, regulations, and quality and safety standards.
(2) The payment rates used by the Medicaid agency must be determined in accordance with methods and standards developed by the agency.
    *    *    *    *    *    *
(b) *State findings.* The Medicaid agency must find that the rates used to reimburse providers satisfy the requirements of [paragraph] (a)(1) ... of this section.
(c) *State assurances.* The Medicaid agency must make assurances satisfactory to the Secretary that the requirements of [paragraph] (a)(1) ... of this section are met....

6. 42 U.S.C. § 1396a(a)(17) provides, in pertinent part, that a State plan for medical assistance must—

(17) include reasonable standards ... for determining eligibility for and the extent of medical assistance under the plan which (A) are consistent with the objectives of this subchapter....

7. 42 U.S.C. § 1396a(a)(30) provides, in pertinent part, that a State plan for medical assistance must—

(30) provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan (including but not limited to utilization review plans as provided for in section 1396(i)(4) of this title) as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care[.]

8. 42 U.S.C. § 1396a(a)(23) provides, in pertinent part, that a State plan for medical assistance must—

(23) ... provide that any individual eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required, ... who undertakes to provide him such services[.]

9. 42 C.F.R. § 447.204 provides:

The agency's payments must be sufficient to enlist enough providers so that services under the plan are available to recipients at least to the extent that those services are available to the general population.

qualified to perform the services required, and fails to provide reimbursement adequate to enlist enough ICF–MR providers so that services under the plan are available in a sufficient amount. Fourth, Plaintiffs claim that the reimbursement rate structure violates 42 U.S.C. § 1396a(a)(10)(B) [10] and therefore 42 U.S.C. § 1983 because it fails to provide reimbursement adequate to assure ICF–MR services to Plaintiffs that are equal in amount, duration, and scope to those provided to other ICF–MR-eligible individuals, and violates 42 C.F.R. § 440.-230(b) [11] because it fails to provide reimbursement adequate to assure that ICF–MR services are sufficient in amount, duration and scope reasonably to achieve their purpose. Fifth, Plaintiffs claim that the reimbursement rate structure violates 42 U.S.C. § 1396a(a)(19) [12] and therefore 42 U.S.C. § 1983 because it fails to provide Medicaid care and services in a manner consistent with Plaintiffs' best interests.

Sixth, Plaintiffs claim that the reimbursement rate structure violates the Equal Protection Clause of the Fourteenth Amendment and therefore 42 U.S.C. § 1983 because it arbitrarily and irrationally establishes a classification of community based ICF–MR providers that are reimbursed at levels substantially lower than the levels of reimbursement to state operated providers and that are insufficient to provide adequate care and services to their residents. Seventh, Plaintiffs claim that the reimbursement rate structure violates Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 et seq.,[13] and the regulations promulgated thereunder, because it discriminates against Plaintiffs on the basis of handicap by denying Plaintiffs' right to benefit from services in the most integrated setting appropriate to their needs.

Eighth, Plaintiffs claim that the reimbursement rate structure violates Sections 7 and 11 of the Mentally Retarded Persons Act, Tex.Rev.Civ.Stat. art. 5547–300,[14] be-

---

10. 42 U.S.C. § 1396a(a)(10) provides, in pertinent part, that a State plan for medical assistance must—

　(10) provide—
　　*　*　*　*　*　*
　(B) that the medical assistance made available to any individual described in subparagraph (A)—
　(i) shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual, and
　(ii) shall not be less in amount, duration, or scope than the medical assistance made available to individuals not described in subparagraph A[.]

11. 42 C.F.R. § 440.230(b) provides:
　Each service must be sufficient in amount, duration, and scope to reasonably achieve its purpose.

12. 42 U.S.C. § 1396a(a)(19) provides, in pertinent part, that a State Plan for medical assistance must—
　(19) provide such safeguards as may be necessary to assure that eligibility for care and services under the plan will be determined, and such care and services will be provided in a manner consistent with simplicity of administration and the best interests of the recipients[.]

13. 29 U.S.C. § 794 provides, in pertinent part:
　No otherwise, qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of

his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency.... The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978....

14. The Texas Mentally Retarded Persons Act of 1977, Tex.Rev.Civ.Stat.Ann. art. 5547–300 (Vernon Supp.1981), provides in pertinent part:
　　*　*　*　*　*　*
　Sec. 7. Every mentally retarded person shall have the right to live in the least restrictive setting appropriate to his individual needs and abilities. This includes the person's right to live in a variety of living situations, such as the right to live alone, in a group home, with a family, and in a supervised, protective environment.
　　*　*　*　*　*　*
　Sec. 11. Every mentally retarded person shall have the right to receive adequate treatment and habilitative services for mental retardation suited to the person's individual needs to maximize the person's capabilities and enhance the person's ability to cope with his environment. Such treatment and habili-

cause it fails to provide reimbursement to Ada Wilson Hospital and other ICF–MR Level V and VI providers in an amount sufficient to provide adequate treatment and habilitative services suited to Plaintiffs' individual needs, and because it violates Plaintiffs' right to live in the least restrictive environment appropriate to their individual needs and abilities. Ninth, Plaintiffs claim that the Defendants' use of, in effect, the 40th percentile as the rate cap violates TDHR Rule 326.35.99.200(d), which requires that reimbursement rates for each class of service be selected by use of the 60th percentile of Medicaid day of service.

Defendants generally deny that the Texas reimbursement rate structure is in any way violative of state or federal laws or regulations. In addition, Defendants argue that Plaintiffs lack standing to raise these issues and that the only proper remedy available to Plaintiffs is an action against Ada Wilson Hospital seeking to prevent Plaintiffs' discharge from the hospital and requiring the hospital to live up to its agreement with the State to provide Plaintiffs adequate care and services.

Having given careful and thorough consideration to the difficult and broad-ranging claims raised by Plaintiffs in light of the arguments of counsel and the testimony received at the hearing on the motion for preliminary injunction, and in light of the four factors courts traditionally consider in determining whether to grant pretrial equitable relief, the Court has determined that Plaintiffs have met their burden with respect to each of the four relevant factors and should receive preliminary injunctive relief. The decision to grant the preliminary injunction is based upon the Court's conclusions with respect to only one of Plaintiffs' claims—that the manner in which ICF–MR reimbursement rates were set by Defendants, and Defendants' finding and assurances to HCFA that the rates were reasonable and adequate to meet the costs necessarily incurred by efficiently and economically operated facilities, were arbitrary, capricious and inconsistent with the basic federal reimbursement standard and certain regulations promulgated thereunder. The reasoning utilized by the Court in arriving at this conclusion is set out below. Resolution of the motion for preliminary injunction on the basis of this relatively narrow issue renders it unnecessary for the Court to consider the remainder of Plaintiffs' claims.

## II.

## THE CLAIM AT ISSUE HERE: WHETHER THE MANNER IN WHICH DEFENDANTS SET REIMBURSEMENT RATES WAS ARBITRARY, CAPRICIOUS, AND INCONSISTENT WITH FEDERAL LAW

As stated above, the Court has determined that Plaintiffs have met their burden of proof for purposes of preliminary injunctive relief with respect to their claim that TDHR acted arbitrarily, capriciously, and in a manner inconsistent with 42 U.S.C. § 1396a(a)(13)(A) and certain regulations promulgated thereunder in adopting the current reimbursement rate scheme and in finding and relaying assurances to HCFA that the new scheme satisfied the federal statutory standard. Before stating the contentions of the parties and the Court's analysis with respect to this issue, it is important to set out in greater detail the facts relating to Defendants' adoption and implementation of the current reimbursement rate structure.

### A. Background Facts

According to the testimony of Merle Moden, director of rate-setting for TDHR and the person who supervised development of the current Texas ICF–MR reimbursement rate scheme, the basic decision to change the reimbursement structure from the old "facility-by-facility" scheme to a uniform rate scheme was brought about by TDHR's

tative services shall be administered skillfully, safely, and humanely with full respect for

the dignity and personal integrity of the person.

experience with rising program costs under the old scheme. According to Mr. Moden, the facility-by-facility structure, which set rates retrospectively on the basis of providers' actual costs, pushed costs rapidly upward with little or no built-in provision for cost containment.[15] Moden described the facility-by-facility structure as, in essence, "telling a provider, 'spend what you choose to spend.'"

By the time TDHR conducted a review of 1979 ICF–MR provider costs reports, it was clear to the agency that costs for the ICF–MR program would be higher than legislative appropriations for the years 1980 and 1981. Moden testified that because of TDHR's concern with budget overruns, the "cost-push" nature of the facility-by-facility scheme, and the lack of a workable provision for cost containment, TDHR began in early 1980 to consider the possibility of returning to a uniform rate structure. In October of 1980, TDHR published a proposal for a uniform reimbursement rate structure in the Texas Register and conducted public hearings around the state. According to Moden, significant differences in costs reported by similar providers led TDHR to give more study to the problem before making the final decision to adopt the uniform rate scheme. Moden testified that TDHR subsequently engaged the services of a consultant to do a statistical analysis in an attempt to determine why reported costs of providers within the levels of care varied so substantially. According to Moden, the consultant's study was "totally unsuccessful in trying to explain any costs as a result of differences in client needs." TDHR subsequently concluded that increased costs were, to a large degree, a result of the lack of cost containment measures in the facility-by-facility rate structure. On the basis of these conclusions, TDHR made the decision to move forward with a uniform rate structure.

On June 16, 1981, an amended version of the proposed uniform rate scheme was published in the Texas Register; this proposal was adopted, with some alterations not significant to this litigation, in the August 18, 1981 Texas Register. HCFA approved the new reimbursement rate structure in November of 1981 and the new rates became effective December 1, 1981.

Moden testified that after TDHR made the basic decision to return to a uniform reimbursement rate structure utilizing a 60th percentile cap but before the determination was made regarding what, if any, costs would be excluded from the cost data base and, therefore, before the final determination was made with respect to the level at which rates were to be set, TDHR was informed that the Texas Legislature had placed a cap of $57,285,473.00 on expenditures for the community based ICF–MR program for fiscal year 1982 and had prohibited transfers of funds from other programs to cover ICF–MR deficits. Moden testified that TDHR's knowledge of this legislative appropriations cap played a significant role in its decisions with respect to the level at which rates would be set.

Moden testified that before costs at the 60th percentile of Medicaid day of service were computed, certain costs were excluded by TDHR from the raw cost data base as excessive, resulting in a situation in which rates were set, in effect, at the 40th percentile rather than at the 60th percentile. According to Moden, TDHR's authority to exclude certain costs as excessive flowed from a TDHR rule, published in the Texas Register in December of 1978, providing that costs not reasonable and necessary to provide care would be excluded in the rate-making process.

Moden stated that TDHR's determination to exclude certain costs before computation of the 60th percentile was based solely upon a "marketplace analysis." The central thesis of TDHR's "marketplace analysis" was that the reported costs of any provider in a given cost area that were significantly higher than the costs of other providers

within the same level of care were deemed unnecessary and excessive and unrelated to patient care. Moden's testimony made it clear that the fact that certain providers' costs were higher than those of other similar providers was the only reason why those providers' costs were excluded as excessive. He testified that no specific determination was made that Ada Wilson or any other community based ICF–MR facility was not operating in an economical or efficient manner. He further testified that no studies were made of the costs of any required services, and that no attempt was made to study the forms of treatment offered at the various ICF–MR facilities in order to identify facilities that might be providing unnecessary or redundant services. In sum, according to Moden, TDHR's conclusion that excessive services were being offered by some facilities and that those facilities' costs were therefore excessive was based solely upon the fact that certain providers reported significantly higher costs than other providers. Moden further testified that the way in which TDHR ensured that rates set at the 40th percentile would be adequate to cover the costs of economical and efficient facilities operating in conformity with state and federal requirements was its reliance upon the Department of Health's certification that all facilities, including those whose costs were at or below the 40th percentile, were meeting all applicable federal and state care and safety standards.

### B. *Plaintiffs' Arguments and Defendants' Responses*

Plaintiffs have identified two primary problems with the process that culminated in TDHR's adoption of the current uniform reimbursement rate structure, each of which they claim renders TDHR's adoption of the new plan, and its subsequent findings and assurances to HCFA of the plan's compliance with the statutory standard, violative of federal law and regulations. It is important to understand that Plaintiffs' arguments with regard to this issue are separate from an issue they also raise but that this Court does not decide—that application of the current reimbursement structure re-

sulted in rates that are actually too low to cover the costs that efficient and economical providers must incur to meet the habilitative needs of their residents. The arguments discussed here relate to the process by which the rates were set rather than the actual adequacy of the rates that resulted from application of the new rate structure. It is also important to note at the outset that Plaintiffs challenge neither the Defendants' authority to set a uniform reimbursement rate nor their authority to set rates at levels lower than those under the old facility-by-facility rate scheme. Rather, Plaintiffs challenge the Defendants' decision to set the uniform rate at the 40th percentile level.

First, Plaintiffs argue that although Defendants purported to find that the reimbursement rates were adequate to meet the necessary costs of efficiently and economically operated facilities, and made required assurances to HCFA to that effect, Defendants actually made no real attempt to ensure, and thus failed to ensure, that the rates were in fact adequate to meet the necessary costs of efficient and economical providers. More specifically, Plaintiffs argue that in setting reimbursement rates at, in effect, the 40th percentile, TDHR did not adequately take into consideration certain highly relevant factors, most importantly that some providers, such as Ada Wilson Hospital, are responsible for the care of a greater proportion of persons whose needs are greater, and therefore whose care is more costly, than other providers. Plaintiffs contend that TDHR's admitted assumption that all providers should have, in effect, average costs because they have populations with similar needs simply does not square with the reality that certain mentally retarded Medicaid recipients within the same level of care have greater needs which are more costly to meet than others, and that some facilities have taken on a greater number of these more costly cases. Second, Plaintiffs argue that Defendants' exclusion of certain provider costs from its raw data base before applying the 60th percentile cap was an intentional and improper effort to

manipulate the community based ICF–MR budget by bringing it down to a level that would fall within the 1982 legislative appropriations cap.

### 1. *Failure to Ensure Adequacy of Rates and the Problem of Provider Specialization*

As stated above, Plaintiffs' first contention in support of their argument that Defendants acted arbitrarily, capriciously and in violation of federal law and regulations in adopting the current reimbursement rate structure is that the process used by Defendants in setting rates failed to ensure that the rates were adequate to meet the necessary costs of efficient and economical facilities operated in conformity with federal and state standards, thereby violating 42 U.S.C. § 1396a(a)(13)(A) and 42 C.F.R. § 447.252, which require Defendants to find the rates to be adequate and to submit assurances of the adequacy of the rates to HCFA. Plaintiffs maintain that TDHR's method of setting rates amounts to a mere assumption that if the group of ICF–MR facilities with costs at or below the 40th percentile could meet the needs of their residents at that rate, then all facilities could do so. Plaintiffs contend that TDHR made no attempt to verify this basic assumption, citing TDHR's failure to conduct any studies designed to determine the costs of various required services, to determine whether any facilities were offering unnecessary or redundant services, or to determine whether any facilities were in any other way operating inefficiently or uneconomically. Put another way, Plaintiffs fault TDHR for making the decision to exclude certain costs as excessive solely on the basis that they were significantly higher than the costs of other providers and, in addition, applying a 60th percentile cap to this adjusted data base, without determining in some independent manner that the costs were in fact excessive or that the facilities incurring the high costs were operating inefficiently and uneconomically. In addition, Plaintiffs contend that the primary assumption of the rate structure—that all facilities within the same level of care should incur approximately the same costs because they care for populations of residents that, on the average, require similar services at similar costs—was not properly verified by TDHR and is in fact fallacious.

Specifically, Plaintiffs raise the argument that Defendants failed adequately to take into consideration what may, in shorthand terms, be referred to as the special set of problems posed by "provider specialization." This argument is based upon two basic premises: (1) that some providers' costs are necessarily higher because they are responsible for the care of a greater proportion than other providers of ICF–MR residents whose habilitative needs are greater, and whose care is thus inherently more costly to provide, than other ICF–MR residents; and (2) that because the basic federal statutory standard requires that reimbursement rates be adequate to meet the costs necessarily incurred by efficient and economical facilities and charges state Medicaid agencies with ensuring the adequacy of the rates they set, Defendants have a duty under that statute to give careful consideration to the problems posed by provider specialization and to make sure that the rates they set are high enough to cover the higher costs necessarily incurred by those efficiently and economically operated facilities that have taken on a greater proportion of more costly cases. Plaintiffs argue that Defendants have failed adequately to perform this duty.

Plaintiffs' primary example of a facility that is responsible for the care of a greater proportion of more needy and therefore more costly ICF–MR residents is Ada Wilson Hospital. Plaintiffs produced undisputed testimony at the preliminary injunction hearing establishing that all of the residents of Ada Wilson Hospital's ICF–MR facility are children, and that 65 of the hospital's 72 residents (or approximately 80%) have been identified as having multiple handicaps.[16] According to the testimo-

---

16. Testimony produced by Plaintiffs indicated that in addition to being mentally retarded,

ny, 90% of these children require occupational therapy, 70% require some form of speech therapy, and 40% require physical therapy.

Testimony at the hearing also indicated that other Texas ICF–MR Level V and Level VI providers care for children with specialized problems. According to the testimony, only two Level V facilities serve children. Of these, Crossroads, the other Level V children's ICF–MR facility (a combination Level V and Level VI facility), serves primarily very active ambulatory adolescents. Testimony indicated that facilities within Level VI also specialize in care of children with certain types of needs, for example, the Human Development Center in Corpus Christi, which specializes in children with extensive medical needs, and the Denton Development Center, which specializes in children with greater educational and developmental needs.

Plaintiffs also produced a significant amount of testimony indicating that the habilitative needs of mentally retarded children generally are greater than those of mentally retarded adults within the same level of care, and that the cost of care for children consequently is higher than the cost of care for adults. According to the

testimony, mentally retarded children are more active than mentally retarded adults classified in the same level of care, thus requiring more staff supervision. In addition, testimony indicated that because mentally retarded children, unlike mentally retarded adults, generally have not acquired basic living skills before placement in community ICF–MRs, they require more developmental training for and more assistance with such basic skills as feeding, toileting, bathing, and dressing than do adults, and that providing this type of care requires a greater number of personnel than would be needed to care for mentally retarded adults.

Plaintiffs also produced testimony indicating that mentally retarded persons with habilitative needs related to physical and mental handicaps requiring physical, speech, or occupational therapy, or a combination of such therapies, necessarily require more staff personnel and are thus more costly to serve than persons similar in most respects but having little or no such need for therapy. Plaintiffs note that the requirement for greater numbers of staff members to care for ICF–MR residents with greater needs flows directly from federal regulations, citing, *inter alia*, 42 C.F.R.

many Ada Wilson residents suffer from serious physical and developmental handicaps. According to the testimony, many of the children exhibit hyperactive, aggressive, and destructive or self-destructive behavior; many have severe physical, visual, hearing, or speech and communication problems, or a combination of these problems. The program director for Ada Wilson Hospital testified with respect to the disabilities of the named Plaintiffs. His testimony revealed the following information about the named Plaintiffs:

Royal Thomas, a fourteen year old girl, is severely mentally retarded. She exhibits maladaptive behavior such as being aggressive with staff and peers in the facility. She has very limited self-help skills, a seizure disorder, and very little expressive speech.

Bradley Depuy is an eleven year old boy classified as severely mentally retarded. He wears a protective helmet due to his self-abusive behavior. He has very minimal verbal skills which usually involve one-word utterances. He is very aggressive toward his peers and very destructive toward hospital property.

Scott Szust is a twelve year old boy who has cerebral palsy and is legally deaf. He is able to

walk only with the assistance of a walker. He is mute and uses sign language to communicate.

Curtis Lindsey is a ten year old boy diagnosed as being moderately mentally retarded and having post-trauma cerebral palsy as a result of a serious head injury in 1973. He has very limited self-help skills, and is ambulatory only with a walker. He wears a protective helmet because of his unsteady gait and his tendency to fall and injure himself, and he exhibits some uncooperative behaviors.

Tracy Martin is a twelve year old girl functioning in the severe range of mental retardation. She demonstrates behavioral problems such as uncooperativeness, aggression, and hyperactivity. She is very active, easily distracted, and requires constant supervision to ensure her safety and the safety of other residents.

Brandon Knute Ostrom is a nine year old boy with a seizure disorder. He is classified as hyperactive, and is very impulsive and aggressive. He has a history of running away from the facility if not adequately supervised. He has a speech disorder, very little expressive language, and a short attention span.

§ 442.456, which requires an evaluation by an interdisciplinary team of each resident's needs and development of an individual habilitation plan to meet those needs; 42 C.F.R. § 442.463, which requires ICF–MRs to provide training and habilitation services to all residents regardless of age, degree of retardation, or accompanying disabilities or handicaps; and 42 C.F.R. § 442.464, which requires that ICF–MRs have enough qualified training and habilitation personnel and support staff to carry out the training and habilitation program. In addition, Plaintiffs point to 42 C.F.R. § 442.445(c), which requires the highest staffing ratios for ICF–MR living units serving children under the age of six years, severely and profoundly retarded, severely physically handicapped, or residents who are aggressive, assaultive, or security risks, or who manifest severely hyperactive or psychotic-like behavior.

Finally, Plaintiffs introduced testimony indicating that the size of the direct care staff employed by an ICF–MR facility and the resulting staff costs are a very significant component of, and thus may have a dramatic effect upon, the facility's overall costs. According to the testimony, 67% of Ada Wilson's costs are in direct care staff costs. Average direct care staff costs in fifteen of the ICF–MRs operated by National Living Center (both children's and adult's) are 49.8% of overall costs. Crossroads' (children's combination Levels V and VI facility) staff costs are 62.9%, and Denton Development Center's (children's Level VI facility) staff costs are 69.9%.

In connection with this argument, Plaintiffs take the position that Ada Wilson Hospital is operating in an efficient and economical manner to the greatest possible extent consistent with the needs of its residents. They emphasize that no determina-

tion has been made that Ada Wilson Hospital or any other community based ICF–MR was not or is not operating in an efficient and economical manner. In an attempt to support their argument that Ada Wilson Hospital is operating efficiently and economically, Plaintiffs introduced testimony that the hospital has made numerous cost saving program and personnel cuts in an effort to come within the lowered reimbursement rate, including termination of many staff positions. Plaintiffs also introduced expert testimony indicating that the services provided by Ada Wilson to the named Plaintiffs are necessary and minimal, with possible shortcomings in speech and physical therapy. There was testimony that Ada Wilson had never been told in any compliance survey that it was providing too many services but, on the other hand, had been informed repeatedly that the facility was not providing enough services. Plaintiffs' witnesses testified that the cost saving measures undertaken by Ada Wilson have resulted in a situation in which the facility is no longer meeting all of the active treatment needs for many of its residents, some of whom were in the group of fourteen scheduled for discharge. Testimony further established that future staff cuts of fourteen or fifteen direct care workers were proposed in order to bring costs within the reimbursement level, but that these additional staff reductions have thus far not been made because, in the opinion of the administrators and interdisciplinary team at the hospital, these further staff reductions would make it impossible for the facility to provide active treatment to its current residents and would endanger the safety of Plaintiffs.[17] Plaintiffs' witnesses testified that the decision to discharge the fourteen children from Ada Wilson was based upon the professional judgment of the hospital's administrators and interdisciplinary team

17. Plaintiffs note that their needs for services have been determined by a professional interdisciplinary team as required by federal regulations. See 42 C.F.R. §§ 442.418–.422 and 442.-456. Because Plaintiffs' service requirements have been professionally determined pursuant to federal regulations, Plaintiffs contend that Defendants must provide reimbursement at a level adequate to meet the costs of the services called for in Plaintiffs' individual habilitation plans. Likewise, Plaintiffs argue that courts must defer to the judgment of qualified professionals on the issue of what services are required, citing Youngberg v. Romeo, —— U.S. ——, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).

that the facility could no longer provide them the type of program of active treatment required by federal law under current reimbursement rates, and that the staff of the hospital believed that federal law required the hospital to discharge the children if it could not provide adequate care. *See* 42 C.F.R. §§ 442.418, 442.404(c)(2).[18] According to testimony and representations of counsel, six of the fourteen children scheduled for discharge in May had been placed in other facilities by the time of the preliminary injunction hearing—five in state schools and one in a state center; at that time eight children had not obtained placement. To the Court's knowledge, at the time of the hearing none of the named Plaintiffs had obtained placement in another facility.

In an attempt to support their argument that Ada Wilson's situation is representative of other community based ICF–MRs, Plaintiffs introduced the testimony of the Regional Vice-President of National Living Centers, a company operating fifteen ICF–MRs in Texas, some of which serve children, including Crossroads, Denton Development Center and Human Development Center. She testified that Crossroads, the other Level V children's ICF–MR, is currently experiencing financial losses of $29,000.00 per month, and that Denton Development Center, a Level VI children's facility, is losing $22,600.00 per month.[19] She testified that substantial staffing and other cutbacks had been made in response to the reduction in reimbursement rates, that active treatment could not be provided to Crossroads or Denton residents if further staff or program cuts were made, and that the facilities are operating in an efficient and economical manner. Finally, she stated that although the financial losses of these facilities are currently being absorbed by the National Living Centers chain, both facilities are being very careful about admitting clients with high-cost needs, and are considering the possibility of discharging a part of their population or closing entirely if the reimbursement rate remains at the current level.

The second premise of Plaintiffs' "provider specialization" argument is that Defendants have a duty to give careful attention to the problems posed by provider specialization in order to ensure that the rates they set are high enough to meet the necessary costs of economical and efficient facilities that care for a greater proportion of more costly cases. Support for this argument is drawn from the basic federal statutory standard and its attendant regulations, as well as the legislative history leading to its adoption. Plaintiffs note that the basic federal statutory standard mandates that the state Medicaid plan provide for payment of ICF–MR services through the use of rates that are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with all applicable quality of care and safety standards. The statute charges the appropriate state agency with developing methods and standards for determining rates of reimbursement, and spe-

---

18. Several of Plaintiffs' witnesses testified with respect to the detrimental effects that discharge from their facilities would have upon these children. There is no need to recite that testimony in detail. The gist of the testimony was that the children's present placement is appropriate, that their only real options upon discharge would be care at home or placement in a state school, that their placement in state school would not be appropriate and would be significantly more restrictive than community based placement, that adequate care could not reasonably be provided them at home, and that placement in state school or home would be detrimental to their behavioral and developmental progress.

19. Testimony indicated that Human Development Center, a Level VI facility operated by National Living Centers specializing in nonambulatory medically needy children whose developmental needs are less than those of other children by virtue of their medical condition, did not suffer a reduction in reimbursement rates under the new system and is losing substantially less money per month than Ada Wilson, Crossroads and Denton Development Center. Likewise, Human Development Center's staff costs account for only 54.8% of its overall costs, a lower percentage than that reported by the other children's facilities.

cifically requires the State to find, and to make assurances satisfactory to HCFA, that the resulting rates are in conformity with the statutory standard of reasonableness and adequacy. In addition, Plaintiffs cite 42 C.F.R. § 447.252(a)(1), which tracks the "reasonable and adequate" language of the basic statutory standard, as well as § 447.252(b) and (c), which restate the requirement of the statute that the Medicaid agency find and make assurances satisfactory to HCFA that the rates used to reimburse providers are in fact reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers. Finally, Plaintiffs cite the legislative history of the basic federal statutory standard, arguing that it was the intent of Congress that the discretion given to states in selecting and implementing reimbursement systems would not result in substantive changes in program requirements or quality of care. Plaintiffs particularly emphasize the statement in the Senate Report that "[t]he flexibility given the states is not intended to encourage arbitrary reductions in payment that would adversely affect the quality of care" and the comment in the Conference Report that "[i]n determining whether the rates proposed by a State are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities, the Secretary is not expected to approve a rate lower than the applicable legal requirements would mandate."

Drawing from these sources, Plaintiffs argue that because the state Medicaid agency is charged with a primary duty of ensuring that the rates it develops are adequate and reasonable to meet the costs necessarily incurred by efficiently and economically operated facilities meeting the standards of care embodied in the federal ICF–MR requirement for active treatment, the state Medicaid agency has a concomitant duty to consider all significant and relevant factors bearing upon the adequacy of rates. Because the problem of "provider specialization" outlined above has a significant bearing upon the adequacy of reimbursement rates, it must be considered and taken into account in the State's ratesetting determination.

Finally, Plaintiffs contend that Defendants failed adequately to consider the problem of provider specialization in setting rates, and failed to take into account the effect that the rates it set would have upon economically and efficiently operated facilities whose costs were necessarily higher because they serve a greater proportion than otherwise similar facilities of residents whose care is inherently more costly than others. Plaintiffs argue that Defendants made no meaningful attempt to verify the primary assumption of the rate structure—that all facilities within the same level of care should incur approximately the same costs because they care for populations of similar residents. Plaintiffs cite TDHR's failure to conduct any studies designed to determine the costs of various required services, to determine whether some facilities serve populations requiring more services, and to study the differences between adult and children's facilities. They note Mr. Moden's testimony that TDHR considered neither the possibility of providing a separate rate for children's facilities nor of utilizing a uniform rate coupled with an opportunity for an individual facility to document the need for additional reimbursement due to the type of residents served.

Plaintiffs contend that as a consequence of Defendants' failure adequately to consider the problems of provider specialization, Defendants have failed to ensure the adequacy of the rates they set, creating a situation in which some providers, unable to provide all federally required habilitative services for their residents, are unable to admit children with high-cost needs and are being forced to discharge some of their most needy residents and to face the ultimate prospect of being forced to close their ICF–MR programs entirely. Plaintiffs maintain that Defendants' failure to consider the problems of provider specialization and to implement a sufficient mechanism for ensuring the adequacy of reimbursement rates renders Defendants' reimburse-

ment rate scheme arbitrary, capricious, and in violation of federal law and regulations.

Defendants generally deny Plaintiffs' claim that TDHR did not take appropriate measures to assure the adequacy of ICF–MR reimbursement rates. They emphasize that Defendants were forced by the cost-push problems experienced under the old facility-by-facility reimbursement rate structure to take substantial cost containment measures, and argue that their "marketplace analysis" was a rational and reasonable mechanism for dealing with those problems. They stress that one of the primary purposes of the new basic federal statutory reimbursement standard is to provide states with a great deal of flexibility in ratesetting, and that Defendants have exercised their ratesetting discretion in a reasoned and responsible manner. They argue that regulations adopted by TDHR in 1978 specifically authorize their exclusion of certain costs as unnecessary and excessive, and contend that they are entitled to rely upon the Texas Department of Health's certification that all facilities at or below the 40th percentile cost level are operating in conformity with applicable care and safety standards.

With regard to Plaintiffs' "provider specialization" arguments, Defendants made no attempt specifically to refute the thrust of Plaintiffs' contention that some facilities' costs are higher than others because they are responsible for a disproportionate number of more needy and therefore more costly clients. Rather, Defendants note that professionals can, and often do, disagree with respect to what type of care and services are required to meet the "needs" of mentally retarded persons eligible for ICF–MR placement. They emphasize that due to its lack of cost containment measures, the old method of reimbursement presented an opportunity for facilities that were geared to provide unlimited services to diagnose their residents as having virtually unlimited needs. Likewise, they contend that the testimony introduced by Plaintiffs with respect to the greater-than-average needs of the residents of some facilities merely reflects, in effect, a self-serving

tendency on the part of the professionals in those facilities to evaluate their residents as needing the maximum amount of services those facilities are equipped to provide. Defendants also note the study undertaken by TDHR in an attempt to explain why costs reported by providers varied substantially within the same level of care, citing the fact that the study was unable to correlate facilities' reported costs with the varying needs of ICF–MR residents.

Defendants also argue that to the extent that some providers are unable adequately to meet the needs of their residents under the current reimbursement rates, that inability to function is the product of the choice of those providers to specialize in high-cost cases rather than the reimbursement system devised by the State. Defendants contend that providers have no right to "specialize themselves into a corner," citing the providers' contractual obligation to perform services at a rate set by TDHR. Defendants further argue that since any fault lies with the business judgment of the providers rather than the system created by the Defendants, Plaintiffs lack standing to raise claims for injunctive relief against state officials, and that the only remedy available to Plaintiffs would be an action against the providers forcing them to live up to their contractual obligation to provide appropriate care and services within current rates. In a similar vein, Defendants argue that although there is an administrative procedure available to Ada Wilson Hospital and other providers that wish to contest their rates of reimbursement, Ada Wilson has not sought to avail itself of the opportunity for administrative review. Plaintiffs respond that they clearly have standing to raise their claims, and strenuously deny the existence of any meaningful administrative mechanism in Texas for adjustment of provider rates.

### 2. Impermissible Consideration of Legislative Appropriations Cap

Plaintiffs' second argument in support of their contention that Defendants acted arbitrarily, capriciously and in violation of

federal law and regulation in adopting the current reimbursement rate structure arises from the role played in the ratesetting process by the 1982 Texas legislative appropriations cap for the community based ICF–MR budget. Plaintiffs argue that Defendants' exclusion of certain provider costs from its raw data base before application of the 60th percentile cap was an intentional and improper effort to manipulate reimbursement rates in order to make the total ICF–MR budget fall within the amount appropriated by the Legislature. In support of this argument, Plaintiffs note that Defendants were notified of the appropriations cap before the determination was made to exclude certain costs as excessive. Plaintiffs also point out that before rates were finalized, Defendants had computed that use of the "pure" 60th percentile would result in a budget deficit of more than $8 million, whereas exclusion of certain costs as excessive before application of the 60th percentile would result in a within-budget figure. Plaintiffs also rely upon the testimony of Mr. Moden to the effect that TDHR's knowledge of the legislative appropriations cap and the fact that rates set at the "pure" 60th percentile would run over budget played a significant role in Defendants' decision to set rates at, in effect, the 40th percentile level.[20]

Plaintiffs argue that state Medicaid agencies may exercise their discretion in ratemaking in light of budgetary realities only so long as substantive federal standards of care are not obscured, citing *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), and that states are prohibited from circumventing their guarantee of making reimbursements in accordance with the basic federal statutory standard by failing to take measures to ensure adequate funding of a program's projected expenditures, citing *Alabama Nursing Home Association v. Harris,* 617 F.2d 388, 396 (5th Cir.1980), and *Alabama Nursing Home Association v. Califano,* 433 F.Supp. 1325, 1330 (D.C.Ala.1977). Plaintiffs also cite the statement in the Conference Report specifically noting the intent of Congress "that a State not develop rates under this section solely on the basis of budgetary appropriations."

Defendants respond to Plaintiffs' argument with a denial that the legislative appropriations cap was the sole basis for their reimbursement rate scheme. Defendants emphasize that TDHR's basic decision to move forward. with a uniform reimbursement rate scheme was made before the appropriations cap was enacted,· and that the cap was only one of several factors bearing upon Defendants' ratesetting decisions. Defendants argue that neither the basic federal statutory reimbursement standard and its legislative history nor case law prohibit a state Medicaid agency from taking fiscal considerations into account in its ratemaking process; rather, Defendants contend that budgetary restraints are one of the factors that properly may be considered by the state Medicaid agency in determining the level at which it desires to fund the state ICF–MR program. Defendants strongly emphasize the intent of Congress that states should have maximum flexibility in devising and experimenting with reimbursement methods in order to combat inflationary trends and make the best possible use of scarce public resources.

## III.

## THE COURT'S ANALYSIS

Under established law, this Court must exercise its discretion to grant or deny preliminary injunctive relief in light of four

---

**20.** In response to a question asking whether the $57 million appropriations cap was an important reason for choosing the 40th percentile instead of using the "pure" 60th percentile, Mr. Moden testified, "It was definitely a consideration. The legislature is our leader." Moden also testified that the decision to use the 40th percentile was "certainly colored by the fact that the program could not withstand an $8.3 million deficit." When asked by Plaintiffs' counsel whether it was true that neither the 60th nor the 50th percentiles were chosen because they would result in budget deficits, Mr. Moden replied, "There were reasons why they were not chosen. They were not all the reasons. The fact that the budget would have been busted to this extent certainly colors the situation."

requirements—(1) that plaintiff has a substantial likelihood of success on the merits; (2) that a substantial threat exists that plaintiff will suffer an irreparable injury if the injunction is not granted; (3) that the threatened injury to plaintiff outweighs the threatened harm that the injunction will cause defendant; and (4) that the granting of the injunction will not disserve the public interest. *See, e.g., Canal Authority v. Callaway,* 489 F.2d 567, 572–73 (5th Cir.1974). Each of these elements is a prerequisite for pre-trial injunctive relief, and the plaintiff bears the burden of persuasion on all four elements. *Spiegel v. City of Houston,* 636 F.2d 997 (5th Cir.1981); *Clements Wire & Manufacturing Co. v. NLRB,* 589 F.2d 894 (5th Cir.1979).

After giving much thought and study to the arguments raised by Plaintiffs, as well as Defendants' responses to these arguments, the Court is of the opinion that Plaintiffs have met their burden of proof on all four elements with respect to their claim that TDHR's adoption of the current reimbursement rate structure was arbitrary, capricious and in violation of federal law and regulations, and that injunctive relief is appropriate as to a portion of the class Plaintiffs seek to represent. The Court's analysis with respect to each of the four criteria for preliminary injunctive relief is set out below.

The issues and problems raised by Plaintiffs' arguments are complex and difficult. In grappling with these issues, the Court has become increasingly aware that there are no pat answers, no easy and painless solutions to these problems. Compounding the difficulties inherent in the complex area of provision of Medicaid services to needy individuals by governments with finite resources is the almost total absence of any case authority interpreting the current federal statutory standard governing ICF–MR reimbursement rates. Indeed, because the basic federal statutory standard was so recently enacted by Congress, this Court

has been able to locate only two cases arising under the new statutory standard. Fortunately, however, the Court has not been forced to confront these issues in a complete vacuum, for the Congressional intent in enacting 42 U.S.C. § 1396a(a)(13)(A) has been recorded in the statute's published legislative history, ·and in addition, the Court has been able to glean judicial guidance from some of the cases decided under the old statutory standard.

■ At the outset, the Court notes its full appreciation of the deferential standard governing its review of the actions of the Defendant state agencies and their officials.[21] As the Fifth Circuit stated in *Alabama Nursing Home Association v. Harris,* 617 F.2d 388, 393 (5th· Cir.1980) (citations omitted): "[a] presumption of validity attaches to the actions of administrative agencies. . . . While the presumption is rebuttable, . . . the burden of proof rests with the party challenging the agency's action." The Court may not substitute its judgment for that of the agency. The agency action must be affirmed if a reasonable basis exists for its decision; only if the action is arbitrary and capricious or inconsistent with a federal statute or valid regulation will the Court overturn it. In determining whether the agency action is arbitrary and capricious, the Court merely considers whether the decision was based upon a. consideration of the relevant factors and whether there has been a clear error of judgment. *See e.g., Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *City of Houston v. FAA,* 679 F.2d 1184, 1190 (5th Cir.1982); *Nueces County Nav. Dist. No. 1 v. ICC,* 674 F.2d 1055, 1062 (5th Cir.1982); *Suntex Dairy v. Block,* 666 F.2d 158, 162 (5th Cir.1982). On the other hand, the Court is obliged "to engage in a substantial inquiry." *Overton Park,* 401 U.S. at 415, 91 S.Ct. at 823. The presumption of validity of agency action "is not to shield [the agen-

---

**21.** Although the briefs of the parties do not discuss the standard of review applicable in a situation in which the action of a state rather than a federal agency is challenged, it appears to the Court that the deferential standard of review described above is the appropriate standard. *See Illinois Council For Long Term Care v. Miller,* 503 F.Supp. 1091, 1094 (N.D.Ill.1980).

cy's] action from a thorough, probing, in-depth review." *Id.* It is with this standard in mind that the Court has approached the difficult task of determining whether Defendants' actions are violative of federal law.

## A. *Jurisdiction and Standing*

It is appropriate to discuss at the threshold this Court's jurisdiction and Plaintiffs' standing to raise the claim under consideration by the Court. Although Defendants have raised the issue of standing without making mention of any jurisdictional issue, the Court has considered its jurisdiction *sua sponte* since issues of jurisdiction and standing are often interrelated.

■ In *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), the Supreme Court held that "suits in federal court under § 1983 are proper to secure compliance with the provisions of the Social Security Act on the part of participating States." *Edelman v. Jordan,* 415 U.S. 651, 675, 94 S.Ct. 1347, 1361, 39 L.Ed.2d 662 (1974). More recently, in *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), the Court explicitly held that § 1983 provides a remedy for purely statutory violations of federal law by state officials. Plaintiffs' claim that Defendants acted arbitrarily, capriciously, and in violation of 42 U.S.C. § 1396a(a)(13)(A) in adopting its reimbursement rate scheme clearly falls within the ambit of *Thiboutot* and *Rosado;* it follows that Plaintiffs' claim may properly be brought under § 1983, and that this court has jurisdiction over the claim under 28 U.S.C. § 1331. *See Thiboutot,* 448 U.S. at 8 n. 6, 100 S.Ct. at 2506 n. 6. The Court notes that, in an abundance of caution, it has reviewed the Supreme Court's most recent pronouncements on the subject of the application of § 1983 to claims that state officials have violated federal statutes, *see Middlesex County Sewerage Authority v. National Seaclammers Association,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); *Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), and is satisfied that nothing in those cases affects the application of § 1983 to claims such as Plaintiffs' challenging state action as violative of the Social Security Act.

With respect to the issue of Plaintiffs' standing to sue, the thrust of Defendants' argument is, in short, that because Plaintiffs' injuries, if any, are caused not by the State's reimbursement rate structure but by providers' faulty business judgment, Plaintiffs lack standing to seek a remedy against these Defendants. Defendants also make a related argument that Plaintiffs do not have a sufficient personal interest or "stake" in the controversy concerning the State's reimbursement rate structure sufficient to confer standing upon them to contest the adequacy of reimbursement rates or the method by which the rates were set.

■ The Fifth Circuit recently summarized the law of standing:

The constitutional dimension of the standing doctrine derives from the "case or controversy" requirement of article III of the federal Constitution and thus presents the federal court with a threshold question concerning its power to entertain the lawsuit before it. The remedial power of the court may be exercised only on behalf of a plaintiff who has suffered a threatened or actual injury from an allegedly illegal action. *Warth v. Seldin,* 422 U.S. [490] at 498–99, 95 S.Ct. [2197] at 2204–05 [45 L.Ed.2d 343]; *see Regents of the University of California v. Bakke,* 438 U.S. 265, 280 n. 14, 98 S.Ct. 2733, 2742 n. 14, 57 L.Ed.2d 750 (1978). That injury may be to rights existing solely by virtue of a statute or constitution. "Essentially, the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth v. Seldin,* 422 U.S. at 500, 95 S.Ct. at 2205.

These abstract constitutional principles, which reflect a traditional mistrust of roving judicial commissions and advisory opinions, have been distilled into a two-

part analytical framework by the Supreme Court. Because the federal judicial power exists only to remedy injury to a complaining party, the standing doctrine in its constitutional sense requires a "distinct and palpable injury" to a plaintiff. *Warth v. Seldin,* 422 U.S. at 501, 95 S.Ct. at 2206; *accord, Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 .U.S. 464, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); *Pevsner v. Eastern Air Lines, Inc.,* 493 F.2d 916, 917 (5th Cir.1974). The doctrine also mandates that federal court jurisdiction be invoked only when that distinct and palpable injury can fairly be traced to the challenged conduct, so that the exercise of federal power in that case will redress the alleged injuries. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977); *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 40–42, 96 S.Ct. 1917, 1925–26, 48 L.Ed.2d 450 (1976); *Payne v. Travenol Laboratories, Inc.,* 565 F.2d 895, 898 (5th Cir.), *cert. denied,* 439 U.S. 835, 99 S.Ct. 118, 58 L.Ed.2d 131 (1978).

*O'Hair v. White,* 675 F.2d 680, 686–87 (5th Cir.1982) (en banc) (footnotes omitted). *O'Hair* also noted a fundamental precept of the law of standing—that the issue of standing does not turn on the merits of a Plaintiff's claims but, rather, is controlled by the allegations of the Plaintiff's complaint. *O'Hair,* 675 F.2d at 685; *see also Industrial Investment Development Corp. v. Mitsui & Co.,* 671 F.2d 876, 886 (5th Cir. 1982). For purposes of determining a Plaintiff's standing, the Court must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party. *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

■ In the Court's view, Plaintiffs easily meet the tests of standing set out above. Plaintiffs' complaint clearly alleges that the challenged actions of Defendants have caused them injury. Specifically, the complaint alleges that as a direct consequence of Defendants' failure to take sufficient measures to ensure the adequacy of reimbursement rates as required by federal law, Plaintiffs and members of Plaintiffs' class are being discharged and/or threatened with being discharged by providers who cannot care for Plaintiffs under current reimbursement rates, suffering the threat of placement in a more restrictive setting or of obtaining no ICF–MR placement at all, and that Plaintiffs and their class are not receiving adequate habilitative care in conformity with federal requirements. Plaintiffs' complaint also meets the requirement of an allegation of injuries that "fairly can be traced to the challenged action of the defendant," for the complaint clearly points to Defendants' arbitrary and illegal setting of reimbursement rates as the source of their injuries. Defendants' argument that providers and not state officials are the cause of Plaintiffs' injuries overlooks the doctrine of the law of standing noted above—that it is the allegations of Plaintiffs' complaint that control. Defendants are entitled to attempt to prove that it is the actions of providers and not the state's reimbursement rate structure that has injured Plaintiffs, or that Plaintiffs have not been injured. But these are arguments that relate to the merits of this cause, not the issue of standing, and may not be considered by the Court at this juncture.

Nor does the Court find persuasive Defendants' argument that Plaintiffs lack the requisite personal interest or stake in this controversy. While it is true that payments for ICF–MR care under the Medicaid program are made to providers, and that the benefits accruing to Medicaid recipients under the ICF–MR program are in one sense indirect, it is abundantly clear that it is Medicaid recipients and not Medicaid providers who are the intended beneficiaries of the Medicaid program. *See, e.g., Green v. Cashman,* 605 F.2d 945, 946 (6th Cir.1979); *Case v. Weinberger,* 523 F.2d 602, 607 (2nd Cir.1975); *Pennsylvania Pharmaceutical Association v. Department of Public Welfare,* 542 F.Supp. 1349, 1355–56 (W.D.Pa. 1982). The link between the adequacy of

reimbursement rates paid to providers and the adequacy of care provided to Medicaid recipients is quite obvious. Plaintiffs are clearly within the "zone of interests" that Congress intended to protect in enacting the statutory requirement that ICF–MR reimbursement rates must be "reasonable and adequate." *See Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). The great weight of case authority is to the effect that Medicaid recipients [22] have standing to challenge alleged violations of the Medicaid Act by state officials.[23] *See, e.g., Hodgson v. Board of County Commissioners*, 614 F.2d 601, 606 n. 7 (8th Cir.1980); *National Union of Hospital & Health Care Employees v. Carey*, 557 F.2d 278, 280–81 (2nd Cir.1977); *Roe v. Ferguson*, 515 F.2d 279, 281 (6th Cir.1975); *Pennsylvania Pharmaceutical Association*, 542 F.Supp. at 1355–56; *Morabito v. Blum*, 528 F.Supp. 252, 260–61 (S.D.N.Y.1981); *Roe v. Casey*, 464 F.Supp. 487, 498–99 (E.D. Pa.1978), *aff'd*, 623 F.2d 829 (3d Cir.1980); *Massachusetts General Hospital v. Sargent*, 397 F.Supp. 1056, 1059 (D.Mass.1975); *Smith v. Vowell*, 379 F.Supp. 139, 146–48 (W.D.Tex.1974), *aff'd*, 504 F.2d 759 (5th Cir. 1974). This Court has been unable to unearth even a single case undermining the proposition that the substantive provisions of the Medicaid Act create rights enforceable in federal court by Medicaid recipients alleging an actual injury flowing from state officials' violation of the law. The Court notes that it has carefully considered the only case cited by Defendants on the standing issue, *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980), and is convinced that it is inapposite to and readily distinguishable on numerous grounds from the instant case.

In sum, the Court holds that Plaintiffs have the requisite standing to raise the claim under consideration by the Court and that this Court has federal question jurisdiction over that cause of action.

## B. *The Four Factors*

### 1. *Likelihood of Success on the Merits*

As stated above, the Court has determined that Plaintiffs have established a substantial likelihood of success on the merits with respect to their claim that the manner in which Defendants adopted the current ICF–MR reimbursement rate structure was arbitrary, capricious, and in violation of federal law. The Court has arrived at this conclusion most reluctantly.

Much of this reluctance is derived from the Court's understanding of the basic federal statutory reimbursement standard and its legislative history, for it is evident to the Court that in enacting the new reimbursement standard, Congress intended to establish a system by which states would have a greater amount of flexibility in their choice of ratesetting methods than they had been accorded under the previous reimbursement standard, largely in order to allow the states maximum opportunity for dealing effectively with problems of inflation and provision of unnecessary services and for promoting provider efficiency. It is equally evident to this Court that the goals Defendants sought to achieve by replacing the old

---

**22.** Many Courts have also held that Medicaid providers have an interest in state officials' compliance with the Medicaid Act sufficient to confer standing upon them to bring an action alleging violation of the Medicaid Act by state officials. *See, e.g., Edgewater Nursing Center, Inc. v. Miller*, 678 F.2d 716, 718 (7th Cir.1982); *Nat'l Union of Hosp. & Health Care Employees v. Carey*, 557 F.2d 278, 280–81 (2nd Cir.1977); *Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Dep't of Pub. Welfare*, 602 F.2d 150, 152 n. 6 (8th Cir.1979); *Georgia Hosp. Ass'n v. Dep't of Medical Assistance*, 528 F.Supp. 1348, 1352–53 (N.D.Ga.1982); *Hempstead General Hosp. v. Whalen*, 474 F.Supp.

398, 406–07 (E.D.N.Y.1979), *aff'd*, 622 F.2d 573 (2d Cir.1980); *Alabama Nursing Home Ass'n v. Califano*, 433 F.Supp. 1325, 1328–29 (M.D.Ala. 1977).

**23.** The cases cited in the text are all ones in which the courts have considered the issue of Medicaid recipients' standing to challenge the actions of state officials as violative of the Medicaid Act and have explicitly held that those recipients have standing to raise their claims. A veritable host of cases have entertained such challenges without treating specifically the issue of standing.

facility-by-facility structure with a scheme of uniform reimbursement rates—containment of excessive and unnecessary costs, elimination of unnecessary services, and increased provider efficiency—are worthy and laudable goals which, in and of themselves, in no way conflict with or violate the provisions of the Medicaid Act. The issue in this case is not whether Defendants properly may institute a mechanism for containing costs and eliminating waste but, rather, whether the system adopted by Defendants in an attempt to reach those valid goals was devised in an arbitrary manner.

As stated above, Plaintiffs challenge Defendants' ratesetting process as being arbitrary and capricious on two major grounds: (1) that the process failed to ensure rates adequate to meet the necessary costs of efficient and economical facilities; and (2) that Defendants intentionally and illegally manipulated reimbursement rates to make them fall within the legislative appropriations cap. Plaintiffs' first argument is further divided into two subarguments: (1) Plaintiffs' general contention that Defendants' ratesetting process failed to ensure adequacy of reimbursement rates, and (2) Plaintiffs' more specific argument that the ratesetting process failed to ensure adequacy of reimbursement rates because TDHR failed adequately to take into consideration the problems of provider specialization.

Each of the challenges raised by Plaintiffs with respect to Defendants' ratesetting process are separate and distinct. In the course of evaluating each argument in light of the federal statutory standard and available case law, however, it has become evident to this Court that the problems identified by Plaintiffs are significantly interrelated, and that discussion and legal analysis of Plaintiffs' arguments are therefore most properly accomplished by treating those arguments together. While the Court is unable to agree with every argument presented by Plaintiffs, it is convinced that Plaintiffs have identified serious flaws in Defendants' ratesetting process. Considered separately and in isolation from one another, these flaws might or might not warrant remedial action by this Court; the

Court will offer no speculation with respect to whether a set of facts in which only one of these problems existed would support relief. But under the circumstances of this case, in which several serious problems with TDHR's reasoning process in its ratesetting determinations appear in tandem, the Court has concluded that, taken together, these problems signify a high likelihood of Plaintiffs' ultimate success on the merits in this cause and call for remedial injunctive relief by this Court.

Before embarking upon the task of legal analysis of Plaintiffs' arguments, it is important to state briefly the Court's analysis of the facts with respect to the problem areas identified by Plaintiffs.

With respect to Plaintiffs' general contention that Defendants' ratesetting process is arbitrary and inconsistent with federal law because it failed to ensure adequacy of reimbursement rates, the testimony presented at the hearing, the details of which were set out above, reveals that the reason TDHR changed its reimbursement system from the old facility-by-facility method to a system of uniform rates was in order to contain unnecessary costs and prevent waste by elimination of unnecessary services. The two major ways in which TDHR sought to eliminate unnecessary services and contain costs were its exclusion of provider costs substantially higher than those of other providers (based on its "marketplace analysis") and, after those costs were eliminated, imposition of a 60th percentile cap on the remaining reported costs. In deciding that reimbursement rates should be determined by that method, TDHR admittedly relied solely upon provider cost reports and upon the Department of Health's certification that all facilities operating at or below the 40th percentile level met all relevant federal and state standards.

In the Court's view, the central problem with TDHR's reasoning process is not in TDHR's central decision that unnecessary services were being offered and that providers were operating inefficiently, but

rather in its failure to seek answers to the crucial questions *how many* unnecessary services were being provided and *how much too high* were costs. By looking at cost reports and drawing reasonable inferences from the structure and characteristics of the old reimbursement system, TDHR was able to make the general determination that costs were too high. But to this Court's knowledge, based upon the record in this case, TDHR never sought to institute any type of mechanism for identifying even the *approximate* amount of unnecessary services or costs.

It is true that TDHR identified one possible indicator of provision of unnecessary services—the fact that certain providers' costs were significantly higher than reported costs of other providers in the same level of care. But it is crucial to note that TDHR's exclusion of these "out-of-the-marketplace" costs was only the first step in its program for cost containment, for in addition to its exclusion of those costs, TDHR applied a 60th percentile cap to all remaining reported costs. Admittedly, the notion of using a 60th percentile cap was derived from TDHR's favorable experience with use of that percentile cap in its nursing home program. Yet in the nursing home area only the raw data base was used, with no major exclusion of costs as in the ICF–MR program. It is clear that TDHR's use of the 60th percentile cap was not the culmination of a process designed to identify the amount of unnecessary services or costs in the ICF–MR program, but rather arose simply from TDHR's general knowledge that the 60th percentile cap had worked well in the nursing home area. From all that appears to this Court at this preliminary stage, TDHR never sought to ascertain, and thus never knew, even the approximate extent of provision of unnecessary services or of provider inefficiency. No attempt was made to go outside of provider cost reports in an effort to determine the extent or nature of unnecessary services; admittedly, TDHR undertook no independent study of any facility's provision of services, or its economy and efficiency, nor did it attempt to determine in any manner what the cost of any required services should be.

Nor did TDHR undertake to determine what rates would be "adequate" by means other than identification of the approximate amount of excessive costs and unnecessary services. Rather, the evidence before the Court at this time reveals that TDHR simply relied upon the Department of Health's certification that all ICF–MR facilities, including those operating at or below the 40th percentile level, were complying with all applicable laws and regulations. Thus, rather than conducting any specific study of what rates would be adequate, TDHR reasoned that if facilities operating at the 40th percentile cost level could meet the needs of their residents, then all facilities within the same general level of care category could do so if reimbursed at the 40th percentile level. Of course, TDHR's reasoning in this regard was based upon a crucial theory—that all facilities within the same general level of care category cared for a "mix" of residents with approximately the same need for services. It has become clear to this Court, however, that the crucial theory employed by TDHR that all facilities have roughly the same "mix" of residents was never in fact verified by TDHR in any manner. Rather, it appears, at least at this preliminary stage, that TDHR never took steps to ascertain whether facilities within the same level of care indeed had a similar "mix" of residents before choosing to rely upon the Department of Health's certification as its primary basis for determining adequacy of reimbursement rates.

With respect to Plaintiffs' specific contention that Defendants' ratesetting process is arbitrary and capricious because TDHR failed adequately to consider the specific problems posed by "provider specialization," the evidence establishes the following facts and circumstances.

As set out in greater detail above, Plaintiffs produced evidence at the hearing indicating that, in short, Ada Wilson Hospital specializes in the care of children, a large percentage of whom are multiply handicapped and who have specialized treatment

needs arising from those handicaps. According to the testimony, several other Texas ICF–MRs also specialize in the care of children with particular problems. Plaintiffs also produced significant testimony, albeit testimony of providers or those closely associated with providers, that because of their specialized characteristics, children ICF–MR residents are more costly to serve than adults, and that the needs of multiply handicapped residents are more expensive to meet than those of retarded residents who have few or no accompanying disabilities or handicaps. Plaintiffs also demonstrated the significant effect high direct care costs can have on providers' overall costs. In addition, Plaintiffs introduced significant testimony from a number of witnesses associated with Ada Wilson Hospital that the facility has taken numerous cost saving measures in response to the lowering of reimbursement rates, that Ada Wilson is offering only necessary services, and that it is operating in the most efficient and economical manner consistent with the habilitative needs of its residents. Testimony indicated that other facilities specializing in the care of children, some of which further specialize by caring for children with certain types of disabilities or handicaps accompanying their retardation, have, like Ada Wilson, made significant cutbacks in programs and staff, are not providing unnecessary services, and are operating as efficiently and economically as possible. Undisputed testimony established that several of these children's ICF–MRs, including Ada Wilson, are experiencing significant financial losses under the current reimbursement rates, exerting pressures upon these providers to refuse admission to persons with costly needs and to minimize their losses by discharging some of their more costly residents and replacing them with others less costly to serve.

As stated above, Defendants did not attempt specifically to refute this testimony. Rather, Defendants emphasized that significant room for disagreement exists with respect to identification of the "needs" of ICF–MR residents and the "necessity" of various services, and argued that the testimony of Plaintiffs' witnesses represents a self-serving tendency on the part of providers to inflate their estimates of residents' "needs" in order to justify higher reimbursement rates. However, Defendants offered no specific evidence supporting these assertions. While some of Plaintiffs' witnesses made general admissions on cross examination that professionals may disagree with respect to residents' needs and required services, Defendants did not attempt to introduce any specific testimony or evidence indicating that any of the facilities concerning which Plaintiffs' witnesses testified were offering unnecessary services, or that they were in any other way operating inefficiently or uneconomically, nor did Defendants seek to deny Plaintiffs' claim that certain facilities tend to specialize in more costly cases.

Based upon the evidence before the Court at this time, the Court must conclude that TDHR essentially failed to come to grips with the impact that provider specialization could have upon adequacy of reimbursement rates, including the very real possibility that the primary assumption of the rate structure—that all facilities within the same level of care should incur approximately the same overall costs because they care for populations of residents who are similar on the average—might in fact be fallacious because of the tendency of some providers to specialize in the care of more costly residents. The evidence reveals that TDHR never conducted any form of study to determine whether some facilities serve populations requiring more services than others, and that TDHR did not inquire into the possible differences in terms of necessary services and costs between adult and children's facilities. Similarly, though TDHR is clearly wary of the assessment of resident "needs" as determined by health care professionals and set out in residents' individual habilitation plans, it is clear that TDHR has not attempted any independent study of the characteristics of the residents at any facility and the services being provided to those residents in an attempt to determine what services are necessary to

meet the needs of those residents, whether unnecessary services are being provided, or whether any facility is in any other manner operating inefficiently and uneconomically.

One step taken by TDHR prior to its decision to go forward with a uniform reimbursement rate scheme bears special mention, for it has special significance with regard to the issue whether TDHR adequately considered the problems posed by provider specialization. The record reveals that in late fall of 1980, after the first publication of the proposed uniform reimbursement rate scheme and after public hearings on the proposal, the TDHR staff felt that as a result of significant differences between providers in reported costs, institution of a uniform rate scheme should await study of the reasons for the substantial differences in providers' costs in the same level of care. TDHR thereafter hired a consultant to do a study, apparently some type of regressional statistical analysis, in an attempt to determine why costs varied so substantially among providers in Levels V and VI. Because there was very little testimony introduced at the hearing regarding this study, and because the study itself was not offered as evidence, this Court's understanding of the methodology of the study, its scope and its results are extremely sketchy.

It appears that the study attempted in some way to compare or correlate the varying costs reported by providers under the facility-by-facility reimbursement structure with the "conditions" of residents in the various facilities in Levels V and VI. The variables used to identify residents' "conditions" appear to have been age, IQ, and what was referred to as a "diagnosis code" or ABL (the Court has been informed that "ABL" stands for Adaptive Behavior Level). The Court was provided with only a very general notion of the results of the regressional analysis, but it appears that the study concluded that the substantial differences in costs reported by providers under the facility-by-facility rate scheme could not be explained by differences in resident "conditions" or needs.[24] Testimony revealed that the nature of the study was somewhat limited. According to Mr. Moden, the study was not "an extremely comprehensive analysis," but rather was "an analysis of available information." In addition, Mr. Moden testified on cross-examination that the variables used in the study to represent residents' "conditions"—age, IQ, and ABL—were "gross characteristics" taken from residents' "medical needs forms." The study apparently did not identify residents' conditions in anything other than very crude terms. For instance, it appears that the study made no distinction between a resident with a given IQ who had no need for physical therapy and a resident with the same IQ but with significant therapy needs, nor does it appear to have distinguished residents on the basis of differing behavioral needs other than in an extremely general way.

The above-described study was, from all that appears to this Court, TDHR's sole effort to deal with the issue of provider specialization. Based upon the results of this study, TDHR decided that the differing costs reported by providers in the same level of care category were not attributable to the conditions of their residents but rather to provision of unnecessary services

24. The Court admits confusion with the respect to the results of this study. Mr. Moden first described the results as follows: "We were totally unsuccessful in trying to explain any [reported] costs as a result of differences in client needs." However, he then went on to say that "we cannot find from [the study] that we could predict *any change in cost* as a result of the conditions."

It appears to the Court that there may be a significant difference between these two explanations of the study's results. The first seems to say that the costs actually reported by providers under the old reimbursement structure could not be explained by reference to client condition as defined by the study, in other words, that the study could not explain the "wideness of the spread" in actual reported costs among providers by reference to client needs. The second explanation, however, appears to suggest that *no* differences in reported costs could be explained by reference to client needs.

How much the study proved may depend to a great extent upon which of these explanations comes closest to being accurate.

largely brought about by the old scheme's inherent failure to contain costs.

Finally, with respect to Plaintiffs' claim that Defendants intentionally and illegally manipulated reimbursement rates to make the overall ICF–MR budget fall within the amount appropriated by the Texas Legislature, the following facts appear. It is clear that TDHR's basic decisions to move forward with a reimbursement scheme characterized by a uniform rate of reimbursement for all facilities within the same general category and to reimburse facilities on the basis of the 60th percentile of Medicaid day of service, were made prior to and independent of the Texas Legislature's decision to cap the 1982 ICF–MR budget at roughly $57 million. It is equally evident, however, that TDHR was aware of the legislative appropriations cap before it decided to exclude certain costs as excessive on the basis of its "marketplace analysis." As noted above, the decision to exclude certain costs as excessive was a major factor affecting rate levels, for as Mr. Moden testified, application of the 60th percentile to the "refined" data base produced the same result that would have been achieved had the 40th percentile been applied to the raw data base. Testimony and exhibits produced at the hearing indicate that in July of 1981, the TDHR staff had computed that application of the 60th percentile would produce a budget deficit of over $8 million, and in addition had calculated the various rates and the total figure that would be produced by application of, respectively, the 30th, 40th, and 50th percentiles. TDHR was aware that exclusion of a certain number of reported costs before application of the 60th percentile would produce, in effect, the same results as application of the 40th percentile to the raw data base. Indeed, Plaintiffs introduced into evidence a set of graphs compiled by the TDHR staff which, according to Mr. Moden, were designed to express to laymen how exclusion of certain reported costs operated to convert the 40th percentile of reported costs to the 60th percentile level. Finally, Mr. Moden's testimony establishes that the legislative appropriations cap and the projected budget deficit played a major role in the TDHR decision to exclude certain costs as excessive instead of utilizing the raw data base.

Given these facts, and considering the information upon which TDHR based its decision to set rates at the 40th percentile level, the question remains whether there is a substantial likelihood that TDHR's actions were arbitrary, capricious and inconsistent with the basic federal statutory reimbursement standard. The statute clearly and expressly leaves room for states to cut unnecessary costs in a wide variety of ways. On the other hand, however, it manifestly imposes a substantive limitation on state governmental action—that rates determined by state Medicaid agencies must be high enough to compensate efficiently and economically operated providers for costs necessarily incurred in providing the type of care for their residents that conforms to all applicable state and federal laws and requirements (i.e., to provide residents with "active treatment"). As stated above, under this standard, state Medicaid agencies are free to deny providers compensation for provision of unnecessary services. Likewise, the states are not required to pay all costs incurred by providers that are not operating efficiently and economically. Thus, states not only have a great deal of flexibility in selecting the methods by which rates will be determined, but are also accorded freedom to decide what costs are necessary or unnecessary, and to determine whether and which providers are operating efficiently and economically. In addition, the development of the Medicaid Act and the evolution of the reimbursement system away from Medicare principles of reimbursement make it clear that states are not required to make their decisions concerning "efficiency and economy" and "adequacy" with the greatest degree of precision. Nevertheless, the bottom line of the federal statutory standard, the substantive limit placed by Congress upon the states, is that rates must be sufficient to compensate efficiently and economically operated providers for the necessary costs they incur in providing required care to their residents.

■ Because the federal statutory standard mandates adequate payment to efficiently and economically operated providers for costs necessarily incurred, and because the federal regulations specifically require the state Medicaid agency to find and to assure the federal government that its rates are in fact reasonable and adequate, it follows that in setting reimbursement rates TDHR had the duty to consider and to identify, by some reasonably principled means, what rates would be adequate to compensate efficiently and economically operated providers for necessary services. As an outgrowth of its primary duty to determine what rates would be adequate, TDHR was also under an obligation to consider all significant factors, within the bounds of reasonableness, relevant to the adequacy of reimbursement rates, for without such consideration there could be no reasoned and principled basis for a determination of adequacy. *See California Hospital Association v. Schweiker*, 559 F.Supp. 110 (C.D.Cal.1982) (state Medicaid plan enjoined as arbitrary and capricious based upon failure of state Medicaid agency to consider all factors relevant to reasonableness and adequacy of rates). These duties correspond to the duties imposed upon all administrative agencies that are given the responsibility of administering programs or making decisions under federal statutes. Agencies' actions must be rational and reasonable, and in order to assure that their actions are not arbitrary, agencies must pay adequate attention to all factors made relevant and material by the statutes under which they operate. *See generally* 4 K. Davis, Administrative Law Treatise, §§ 29.00–29.00–5 (Supp.1982), and cases cited therein; Pierce & Shapiro, *Political and Judicial Review of Agency Action*, 59 Tex. L.Rev. 1175, 1180–89 (1981).

■ As stated above, the deferential standard of review of administrative agency action presumes the validity of an agency's action, and the Plaintiff carries the burden of demonstrating that no reasonable basis exists for the agency action or that the agency otherwise acted arbitrarily or in violation of law. Given the facts of this case as they appear to the Court at this preliminary stage, the Court is convinced that Plaintiffs have made a strong showing of likelihood of success on the merits of their claim that Defendants' ratesetting process was essentially arbitrary and capricious. In the Court's view, Plaintiffs have produced enough evidence successfully to rebut the presumption of validity that attaches to Defendants' actions in ratesetting, and Defendants have failed to produce arguments or evidence sufficient to counter Plaintiffs' showing.

■ The evidence presented to this Court indicates that TDHR's decision to set rates at, in effect, the 40th percentile level was based upon extremely limited information. In short, although TDHR properly could infer from the inherent structure of the old facility-by-facility rate scheme and the rapidly rising costs reported by providers that certain facilities were not operating efficiently and economically and that some unnecessary services were being provided, it simply had no information identifying, even approximately, the amount of unnecessary services or the amount of unnecessary costs arising from provider inefficiency. TDHR's exclusion of certain higher-than-average reported costs represents, of course, TDHR's attempt to quantify the extent of unnecessary costs. But it is clear that TDHR's exclusion of "out-of-the-marketplace" costs was grounded in the crucial assumption that all facilities within the same general level of care category had a "mix" of residents with, on the average, about the same need for services. Moreover, as noted above, isolated reference to TDHR's "marketplace analysis" simply does not explain or justify the level at which rates ultimately were set, for TDHR, in addition to excluding certain costs as excessive, applied a 60th percentile cap to all remaining reported costs. To this Court's knowledge, the notion of using the 60th percentile was simply lifted from the nursing home program—it was not the result of any attempt to quantify the extent of un-

necessary services or costs. Nor did TDHR attempt to determine what rates would be adequate for an efficient and economical facility by means other than determining the approximate extent or nature of unnecessary services (i.e., by determining the expected costs of services it deemed necessary). Rather, TDHR simply relied upon the Department of Health's certification that all facilities operating at or below the 40th percentile level were meeting appropriate standards. As stated above, it is evident that TDHR's reasoning in relying on this certification proceeded from the same crucial assumption as did its exclusion of "out-of-the-marketplace" costs—that since all facilities were responsible for residents with, on the average, the same "mix" of needs, then if some facilities could function properly at the 40th percentile level, all facilities in the same level of care could function at a rate set at the 40th percentile. The Department of Health's certification was not intended to and did not verify TDHR's assumption that all facilities served residents with similar needs. It is important to note that the Department of Health's certification did not argue for or lend support to any particular rate level, since the Department of Health simply stated that *all* facilities were operating up to standards, including those with the very lowest reported costs. Given TDHR's assumption that all facilities served similar needs, the Department of Health's certification would have "justified" the use of *any* percentile cap, from one to one hundred.

The significance of Plaintiffs' evidence regarding provider specialization is that it tends to undermine the validity of TDHR's crucial assumption that all facilities in the same general category serve similar needs. Balancing the testimony of Plaintiffs' witnesses against the very general challenges to that testimony offered by Defendants, the Court must conclude that Plaintiffs have made a strong preliminary showing that the assumption upon which TDHR built its reimbursement rate structure was not properly verified and is probably flawed and therefore offers no principled basis for TDHR's actions. In short, Plaintiffs intro-

duced evidence indicating that certain Texas ICF–MRs specialize in the care of children with certain types of characteristics that render their care more expensive than the care of average ICF–MR residents, and that by virtue of the specialization of these facilities in more costly cases, their overall costs are of necessity higher than the costs of facilities that do not so specialize. Significant testimony also tends to establish that these facilities have taken major cost saving measures in response to lowered reimbursement rates, that they are providing only necessary services, that they are operating in the most efficient and economical manner within their knowledge, but that they nevertheless are experiencing significant financial losses.

In light of Plaintiffs' evidence, this Court simply cannot accept Defendants' general assertion that Plaintiffs' witnesses should not be believed because of the existence of disagreement between professionals on the subject of residents' "needs" and because their testimony is self-serving. This Court finds very understandable Defendants' reluctance to accept as accurate assessments of residents' "needs" by professionals who are associated with ICF–MR facilities, for it is evident that these professionals' financial and other interests in higher reimbursement rates for their facilities represent a very real danger that their diagnosis of residents' needs for services may, consciously or unconsciously, be influenced or biased. Likewise, this Court recognizes that there is significant room for disagreement among objective professionals with regard to what is required to meet the federal standard of "active treatment" for a given person and with respect to what that person's individual "needs" might be. Even so, the regulatory scheme under which the ICF–MR program operates is designed in such a way that residents' "active treatment" requirements and service needs are determined by teams of hands-on professionals and must be set out in individual habilitation plans. Taking into consideration the demeanor, qualifications, and experience of Plaintiffs' witnesses, and their

superior and specific knowledge of the conditions of the residents for whom they provide care, and considering the fact that Defendants did not specifically rebut or refute their testimony regarding provider specialization, the Court concludes that the testimony of Plaintiffs' witnesses should be credited.

The Court hastens to note that its decision to credit the testimony of Plaintiffs' witnesses should not be taken to mean that this Court has found as a matter of fact that a problem of provider specialization exists or that the problem is of such significant proportions as to justify higher reimbursement rates for some or all ICF–MR facilities. The Court simply does not have enough information upon which to base such determinations, nor is it appropriate for this Court to do so, especially at such an early stage in this litigation.

This Court is acutely aware that Congress has given state Medicaid agencies, not federal courts, the responsibility of making ratesetting decisions in the first instance. This Court has no particular expertise in the areas of ratesetting or provision of care and treatment to mentally retarded persons, and the Court has no intention of substituting its judgment for that of the agency to which Congress has committed the complex task of ratesetting. The Court simply finds that Plaintiffs have made a credible and strong showing that provider specialization in clusters of high-cost cases probably exists among Texas ICF–MRs.[25]

It is entirely clear that the question of provider specialization has a high degree of relevance and materiality to the statutory issue of adequacy of rates. If it is indeed true that some providers care for a greater proportion than others of significantly more costly cases, then it follows that rates reasonable and adequate for facilities that do not so specialize may well not be reasonable and adequate for the specializers, even if they are operating very efficiently and economically. Indeed, the degree of relevance of the problem of provider specialization is dramatic, for the existence of provider specialization in high-cost cases is diametrically opposed to the central theory upon which TDHR's reimbursement rate structure was grounded. Because the questions raised by provider specialization are so material to the issue of reasonableness and adequacy of rates, it follows that it was incumbent upon TDHR to inquire into and to give adequate consideration to the questions of the existence and magnitude of provider specialization, to re-examine its reasoning and assumptions based upon those inquiries, and to consider the impact that the existence of provider specialization might have upon adequacy of reimbursement rates. As stated above, based upon the record as it stands at this time, the Court concludes that TDHR did not take adequate steps to investigate the problem of provider specialization or its possible consequences, and that TDHR never attempted to verify its primary assumption that all facilities are responsible for approximately the same "mix" of resident needs.[26]

25. The Court recognizes the possibility that the problem of provider specialization may be illusory. It may be that providers fancy that they care for more residents whose care inherently costs more than other providers, when in fact they shoulder no more of such a burden than do their fellow providers. It may be that the Defendants' sense that health care professionals tend to "overdiagnose" is accurate, and that residents do not need the types of services called for by these professionals. The Court recognizes that Defendants might well be able to marshal expert testimony that could place the basis of Plaintiffs' case in serious doubt. But absent any effort by Defendants to offer any specific evidence or testimony countering the testimony of Plaintiffs' experts regarding

residents' needs and the effect of the reimbursement rate scheme on their facilities, and absent any evidence that Defendants have attempted to undertake any study of facilities in an attempt to spot "overdiagnosis" or inefficiency, the Court must conclude that the problem of provider specialization appears to exist and that it is highly relevant to the adequacy of Defendants' rate structure.

26. One final argument of Defendants deserves treatment. At the hearing on the motion for preliminary injunction, Defendants' counsel argued that if, as appeared to be the case based upon the testimony at the hearing, providers indeed specialize in clusters of high-cost cases, then any inability of these providers to operate within current rates is due to faulty business

The only piece of evidence indicating that TDHR gave any real consideration to the problem of provider specialization was Mr. Moden's testimony concerning the statistical analysis commissioned by TDHR. As noted above, however, Defendants chose neither to introduce the study into evidence nor to call its author as a witness, and Defendants elicited very little information from Mr. Moden regarding the study. Although the purpose of the study—to determine why reported costs of providers under the facility-by-facility rate structure varied so substantially among providers in the same level of care—is fairly clear, this Court, after having read and reread the limited testimony regarding the study, has been unable to ascertain with any precision the study's methodology, scope, or results. It is clear, however, that the study was not "comprehensive," and that it employed only crude, or "gross," indicia of residents' "conditions" or "needs." Moreover, it appears that use of these relatively unsophisticated variables may have ignored some crucial differences in client needs that might well account for higher costs.

Under these circumstances, the Court cannot accept this study as proof that Defendants gave adequate consideration to the problems of provider specialization or as an indication that Defendants adequately verified the major assumption of their reimbursement rate structure. Without access to and knowledge of the study, this Court simply has no basis for understanding what, if anything, the study proves or to test its validity in any manner. The Court feels that Plaintiffs have raised substantial doubts with respect to the reliability of the study. In short, it is the Court's view that in light of the strength of the showing made by Plaintiffs, Defendants were under an obligation to demonstrate to the Court in some reasonable fashion that they had fulfilled their duty adequately to consider the problem of provider specialization, and that Defendants failed to discharge that obligation.

The Court notes that it has no desire to place unreasonable burdens upon Defendants in terms of what is required to meet the standard of "adequate consideration" of factors and issues relevant to adequacy of reimbursement rates. The Court recognizes that this area does not lend itself to great precision, and that ratesetting is not and probably never will be an exact science. On the other hand, this Court does not think that it asks too much of a government agency charged with important responsibil-

judgment on the part of the providers and not to the state's reimbursement system. Counsel also argued that a provider has no right to "specialize himself into a corner," and that the contractual obligation of providers to perform services at rates set by TDHR works as a limitation on their freedom to specialize in high-cost cases.

This is a very intriguing argument, concerning which many things could be said pro and con. The Court, however, is convinced that any decision on this issue should await TDHR's consideration of the problem of provider specialization. It appears to the Court that this argument is in the nature of an afterthought, and does not appear to reflect the position taken by Defendants prior to the hearing on the preliminary injunction. Indeed, the record reveals that TDHR largely ignored the problem of provider specialization and took the position that all facilities within the same level of care were responsible for a similar "mix" of resident needs. After Defendants have undertaken adequately to consider the problem of provider specialization and its implications for the integrity of their rate structure, Defendants might indeed become convinced that providers have no right to specialize in clusters of high-cost cases and that the state is not obligated to alter its reimbursement rate structure to accommodate specialization. The Court notes, however, that such a position might not square with the language or purpose of the basic federal reimbursement standard and other provisions of federal law.

The Court also notes that counsel for Defendants admitted at the hearing on the motion for preliminary injunction that "[t]here is no question that some of the plaintiffs in this case are now or will be inconvenienced. There is no question that there is going to be some dislocation. There is no question that perhaps in the short run, perhaps in the long run, there will be some harm." Should Defendants wish to take the position that providers have no right to and should not specialize in high-cost cases, then Defendants should make that fact known to HCFA and inform HCFA of the implications of that position, see 42 C.F.R. § 447.255(b)(2), so that HCFA may exercise its review function in an informed manner.

ities that have major consequences in the lives of people when it requires that agency honestly and in good faith to consider factors relevant to explicit statutory limitations, to articulate with reasonable clarity its reasoning process, and to place before the Court, on the record, the major pieces of information upon which it relied.

■ Against the background of Defendants' fundamental lack of information and their failure to consider highly relevant factors bearing upon the adequacy of reimbursement rates, the problem of TDHR's reliance on the Texas legislative appropriations cap for the ICF–MR budget takes on special significance. As stated above, the amount of the appropriations cap and TDHR's knowledge of the deficit projected to occur through use of the "pure" 60th percentile played a significant role in the choice to set rates at what amounted to the 40th percentile. After a thorough examination of all of the evidence and exhibits in this case, with special attention to the evidence concerning TDHR's knowledge and actions relevant to the issue of the appropriations cap, the Court has come to the reluctant conclusion that the appropriations cap is the only element in the record that begins to explain why TDHR set rates at the 40th percentile level. The Court is not called upon to make a determination on the merits with respect to whether TDHR's only reason for setting rates at the 40th percentile was the appropriations cap, for the Court at this stage passes only upon likelihood of success on the merits. But the evidence before the Court at this time leads it to believe that Plaintiffs have made a strong showing that they are likely to succeed on the merits of their claim that TDHR crossed the bounds of legality by placing conclusive reliance on the amount of money appropriated by the Legislature. In the Court's view, Defendants' argument that budgetary realities may properly be taken into account in the ratesetting process is correct. Certainly states are not prohibited from cutting costs and promoting efficiency by any legitimate means consistent with adequacy of rates and quality of care. It is perfectly legal for a state Medic-

aid agency to seek to arrive at rates that "will both reflect the actual costs incurred and also allow the state to comply with its . . . obligation to balance its budget." *Coalition of Michigan Nursing Homes, Inc. v. Dempsey,* 537 F.Supp. 451, 463 (E.D.Mich. 1982). However, the federal statutory standard and its attendant regulations, as well as its legislative history, clearly require that the *conclusive* factor in rate determinations must not be the amount of money appropriated by a given state's legislature; rather, the state Medicaid agency must make an objective, principled decision with regard to what rates are reasonable and adequate. The law is clear that "[i]nadequate state appropriations do not excuse noncompliance." *Alabama Nursing Home Association v. Harris,* 617 F.2d at 396. This must be true, for "[i]f a state could evade the requirements of the Act simply by failing to appropriate sufficient funds to meet them, it could rewrite the congressionally imposed standards at will. That obviously is not the case." *Alabama Nursing Home Association v. Califano,* 433 F.Supp. at 1330.

One Court recently stated that Congress' primary concern in declaring that reimbursement rates should not be determined "solely on the basis of budgetary appropriations" was that the most recent change in the federal statutory standard "not be read as repealing the rate setting process and returning to pre-1972 reimbursement schemes which determined daily rates simply by dividing the annual budget allotment by the number of patient days." *Coalition of Michigan Nursing Homes v. Dempsey,* 537 F.Supp. at 463. On the record before this Court, and in the absence of any other explanation or justification for the specific rates set by Defendants, it appears that Defendants' actions cross the boundary of permissible consideration of budgetary restraints and may, indeed, represent the very behavior that Congress sought to prevent.

In sum, on the basis of the evidence before the Court at this preliminary stage of these proceedings, the Court finds that Plaintiffs have shown a substantial likelihood of succeeding on the merits of their

claim that the manner in which Defendants devised the current Texas ICF–MR reimbursement rate structure was arbitrary, capricious and inconsistent with federal law and regulations, and that Defendants' finding and assurances to HCFA that reimbursement rates complied with the statutory standard likewise were arbitrary and failed to conform to federal law.

### 2. Substantial Threat of Irreparable Injury

The Court must next consider whether Plaintiffs have demonstrated the existence of a substantial threat that they will suffer irreparable injury if injunctive relief is not granted. At the preliminary injunction hearing, Plaintiffs alleged and introduced evidence of three types of threatened harm arising from Defendants' actions in setting current ICF–MR rates. First, Plaintiffs sought to demonstrate that because of Defendants' arbitrary actions in ratesetting, some ICF–MR residents of Levels V and VI facilities are receiving or will receive care that is inadequate under federal law. Second, Plaintiffs argued that as a result of Defendants' actions, some ICF–MR residents of Levels V and VI facilities are threatened with discharge from their facilities because their facilities are unable to provide them with adequate care at the current rates of reimbursement. Third, Plaintiffs argued that as a result of Defendants' actions, some persons eligible for ICF–MR care in Levels V and VI community based facilities have been or will be unable to secure community based ICF–MR placement because the facilities are or will be unable to provide them with adequate care at current rates of reimbursement. Plaintiffs seek to represent a class composed of individuals residing in or eligible

for care in community based Levels V and VI facilities who, because of Defendants' actions, have been or will be harmed in any of the three ways stated above—(1) those who are receiving inadequate care; (2) those who will be discharged from their facilities; and (3) those who are unable to gain admission to community based ICF–MR facilities.[27]

It is important to note at the outset that the class Plaintiffs seek to represent does not include residents of or persons eligible for placement in community based ICF–MR facilities that did not suffer a reduction in reimbursement rates under the current reimbursement rate structure. Rather, Plaintiffs seek only to represent those persons residing in or eligible for placement in facilities whose rates were actually reduced when the new reimbursement rates went into effect. Thus, the class of persons Plaintiffs seek to represent is substantially smaller in number than the total group of individuals residing in or eligible for ICF–MR placement in community based facilities in Texas. Likewise, Plaintiffs do not seek to represent persons residing in or eligible for placement in Texas community based ICF–MR Level I facilities; Plaintiffs seek only to represent those classified as eligible for care in Levels V and VI facilities. In addition, although Plaintiffs apparently seek to represent all persons residing in or eligible for placement in Levels V and VI facilities who are or will be detrimentally affected by Defendants' reduction of reimbursement rates, it is clear that the testimony and evidence produced by Plaintiffs at the preliminary injunction hearing related primarily to the harm suffered by residents of and persons eligible for placement in ICF–MR Levels V and VI facilities that specialize in the care of children.[28]

27. Although one of the groups Plaintiffs seek to represent consists of those Medicaid eligible persons who are unable to gain admission to community based ICF–MR Levels V and VI facilities, to the Court's knowledge none of the named Plaintiffs has been denied admission to such a facility.

28. There was undisputed testimony at the preliminary injunction hearing that only two com-

munity based Level V ICF–MRs specialize in the care of children. The record does not establish how many community based Level VI facilities specialize in serving children, but the Court has been informed by defense counsel that according to TDMHMR, a total of five community based Level VI facilities specialize in serving children. According to the same source, two other Level VI facilities serve some children, but apparently do not specialize in

Having carefully considered the testimony of Plaintiffs' witnesses and Defendants' responses to Plaintiffs' evidence, the Court concludes that Plaintiffs have demonstrated the existence of a substantial threat of irreparable harm to Plaintiffs and a portion of their proposed class—the class the Court conditionally certifies for purposes of preliminary injunctive relief—[29] and have shown a substantial likelihood

children's care; because these two facilities do not specialize in the care of children, the Court is of the view that injunctive relief in the nature of restoring these facilities' reimbursement rates to the level at which they stood prior to implementation of the current reimbursement rate structure is not appropriate. In addition, according to testimony at the hearing, at least one of the Level VI facilities, Human Development Center, did not suffer a reduction in reimbursement rates when the current rates went into effect, *see* note 19 *supra.* Thus, it appears that the portion of the injunctive relief granted by this Court which preserves the status quo ante by ordering the Defendants to restore reimbursement rates to the level at which they stood immediately prior to the effective date of the current reimbursement rate structure will effect, at most, only six community based ICF–MR Levels V and VI facilities.

**29.** At the time of the preliminary injunction hearing, Plaintiffs had not filed their motion for class certification, *see* Local Rule 300–5(k), United States District Court, Western District of Texas (requiring plaintiff to file class certification motion within 90 days of filing original complaint), and the Court has not yet ruled on the motion. It appears to be settled, however, that a district court may, in its discretion, award appropriate classwide injunctive relief prior to a formal ruling on the class certification issue based upon either a conditional certification of the class or its general equity powers. *See* 3 Newberg On Class Actions § 4100 (1977 & Supps.1980 & 1982) and cases cited therein.

Based upon the evidence presented at the preliminary injunction hearing, the Court is of the view that it is appropriate conditionally to certify a class at this time. Because the bulk of Plaintiffs' evidence related only to facilities that specialize in the care of children, and because none of the named Plaintiffs has been denied admission to a community based ICF–MR, *see* note 27 *supra,* the class the Court now conditionally certifies is narrower than the class Plaintiffs seek to represent in the trial on the merits; the class as defined by the Court does not include residents of ICF–MR facilities that do not specialize in the care of children, nor does it reach those eligible for placement in community based ICF–MRs who seek admission to such facilities. The Court's conditional certification of this class in no way precludes the Court from defining the class more broadly at a later date.

The Court hereby conditionally certifies a class consisting of:

All Medicaid recipients in the State of Texas who are residing in community based Levels V and VI ICF–MR facilities that specialize in the care of children and that experienced a reduction in their rates of reimbursement pursuant to the current ICF–MR reimbursement rate structure adopted by Defendants.

The Court notes that its definition of the class differs slightly from the definition proposed by Plaintiffs in that the Court's definition deletes reference to the types of injury allegedly suffered by members of the class. In the Court's view, since the existence and scope of injury is a disputed issue in this case, a definition of the class that focuses upon the key common characteristic of the class members—the type of facilities in which they reside—is more appropriate than one that identifies the class by reference to the types of injuries allegedly suffered by its members. In the Court's view, reference to the specific types of injury allegedly suffered by the class tends to equate class membership with injury, thereby unnecessarily confusing the issue of class certification with the merits of the case, and tends to make the members of the class less, not more, identifiable.

With respect to the above-defined class, the Court conditionally finds that the prerequisites of Fed.R.Civ.P. 23(a) and (b)(2) have been met. Specifically, the Court finds that it appears at this time that: (1) the above-described class is so numerous that joinder of all members is impracticable; (2) there are questions of law and fact common to the class; (3) the claims of the named Plaintiffs are typical of the claims of the class; and (4) the named Plaintiffs will fairly and adequately protect the interest of the class. In addition, the Court conditionally finds that this class action is properly maintainable under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

As noted above, the Court's certification of the above-described class is merely conditional; the Court will hold a hearing on the class certification motion and carefully examine any briefs, arguments and evidence submitted by both parties before making a formal ruling on the class certification issue. Conditional certification of the class in no way prevents Plaintiffs from attempting to expand the scope of the class, nor does it preclude Defendants from opposing formal certification of any class.

that this threat of irreparable harm has been brought about by Defendants' actions. There is no need to relate in detail the testimony of Plaintiffs' witnesses with regard to the issue of irreparable harm since that testimony was lengthy and has been outlined briefly in previous portions of this opinion. In the Court's view, the evidence clearly establishes that Plaintiffs and the members of the class that this Court has conditionally certified, *see* note 29 *supra*, face a substantial threat of receiving inadequate care in their ICF–MR facilities and of being discharged from those facilities. Having carefully considered all of the evidence with respect to these types of threatened injury, it is clear to the Court that the threatened injuries are irreparable in nature because they cannot be undone through monetary remedies. *See Deerfield Medical Center v. City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir.1981); *Spiegel v. City of Houston,* 636 F.2d 997, 1001 (5th Cir.1981).[30] However, with respect to the third alleged area of injury—the failure of some Medicaid-eligible individuals to gain admission to community based ICF–MR facilities—the Court is of the view that the relatively small amount of evidence in the record at this time falls short of establishing irreparable injury.

The Court notes that it is aware that the witnesses produced by Plaintiffs testified to the threat of injury only with respect to residents of Ada Wilson Hospital and two other community based ICF–MR children's facilities. There is no direct evidence in the record that residents of the remaining community based ICF–MR facilities have been detrimentally affected by the reductions in rates of reimbursement for their facilities. The Court is convinced, however, that the

threat of irreparable injury to residents of these remaining facilities is not speculative or based on an unfounded fear on the part of Plaintiffs. The common characteristic shared by all of the facilities at issue is that they specialize in the care of children, and there is ample testimony to the effect that the provision of care to children is inherently more costly than provision of necessary care to adults. In the Court's view, the evidence tending to establish that Ada Wilson Hospital and the two other community based facilities concerning which the Court heard testimony cannot provide adequate care under the current reimbursement rates, even though they are operating in the most efficient and economical manner they know how, and the evidence demonstrating a substantial likelihood that reimbursement rates were determined arbitrarily, is sufficient to permit the inference that residents of the remaining children's facilities may fairly be anticipated to suffer injuries similar to those facing the residents of the facilities concerning which the Court has heard direct evidence.

The Court also finds that Plaintiffs have demonstrated a substantial likelihood of succeeding on the merits of their claim that Defendants' actions are responsible for the irreparable injury with which they are threatened. The Court's reasoning in reaching this conclusion has been set out in Part III B1 of this opinion. Suffice it to say that in this Court's view, the threatened irreparable injury to Plaintiffs and members of their class appears to be the foreseeable consequence of Defendants' failure to act in a principled manner in devising their reimbursement rate plan; the Court is not persuaded, at least at this point, that the threatened harm to Plaintiffs is attributable to the providers.

---

**30.** Nor does a remedy other than money damages appear to be available to Plaintiffs. To the Court's knowledge, no administrative procedure exists whereby Medicaid recipients may seek adjustment of reimbursement rates for their facilities or challenge the current reimbursement rate structure. Indeed, no such mechanism appears to be available to Medicaid providers. According to counsel for Defendants, while providers may challenge the disallowance of a particular cost in an administra-

tive proceeding, a TDHR decision to allow that cost would make only a "minuscule change in the across-the-board average flat rate that all the providers contribute to." It is clear that no administrative procedure exists for providers to challenge the overall rate structure, or for a particular provider to seek a higher rate of reimbursement based upon evidence that its necessary costs are significantly higher than the average.

In sum, based upon the evidence before the Court at this time, the Court finds that Plaintiffs have demonstrated a substantial threat of irreparable harm to Plaintiffs and residents of the other community based ICF–MR Levels V and VI children's facilities if injunctive relief is not granted, and have shown a substantial likelihood of succeeding on the merits of their claim that this threatened irreparable harm has been caused by Defendants' actions.

### 3. The Balance of Hardships and the Public Interest

Because Defendants are public institutions and public servants charged with administering the Texas Medicaid Program in compliance with law, it is appropriate to consider together the third and fourth issues relevant to preliminary injunctive relief—whether the threatened injury to Plaintiffs outweighs the threatened harm that the injunction will cause Defendants (the balance of hardships) and whether the granting of the injunction will not disserve the public interest. See Spiegel v. City of Houston, 636 F.2d at 1002. In order to assess the nature of the harm that granting of injunctive relief will cause the Defendants and to consider whether injunctive relief will disserve the public interest, it is necessary to focus upon the nature of the injunctive relief that the Court has determined to be appropriate.

Plaintiffs request injunctive relief of three types: (1) prohibiting Defendants from continuing to implement the current reimbursement rate structure with respect to the named Plaintiffs and their class; (2) requiring Defendants to develop and implement a reimbursement rate structure for the Texas ICF–MR program that complies with federal law; and (3) requiring the Defendants immediately to reinstate the reimbursement rate structure utilized prior to the effective date of the current scheme (or, in the alternative, to utilize another reimbursement rate structure that complies with federal law and is approved by the Court) with respect to the named Plaintiffs and their class, until such time as Defend-

ants develop a rate structure that complies with federal law. In short, Plaintiffs request that the Court order Defendants to develop a plan that complies with federal law, and until that time to restore reimbursement rates for the care of Plaintiffs and their class to the level at which they stood before the current rate structure became effective. Although Plaintiffs request relief for all persons residing in or eligible for placement in Texas ICF–MR facilities, the testimony at the preliminary injunction hearing related primarily to residents of Levels V and VI facilities that specialize in the care of children. Thus, the injunction will be in two parts: (1) an order requiring that Defendants develop and implement a reimbursement rate structure that complies with federal law; and (2) an order that until such a system is implemented, Defendants (a) cease utilizing the current reimbursement rate structure with respect to those community based Levels V and VI ICF–MR facilities that experienced a rate reduction and that specialize in serving children, and (b) restore those facilities' reimbursement rates to the level at which they stood immediately prior to the effective date of the current rate scheme.

■ In light of the relatively narrow scope of the injunction, the Court finds that the balance of hardships tips in favor of Plaintiffs and that the injunction will not disserve the public interest. The first part of the injunction requires Defendants to do no more than is mandated in the first instance by federal law—to develop a principled plan for ICF–MR reimbursement rates after considering all significant factors relevant to reasonableness and adequacy of proposed rates, and to make the required finding and assurances to the federal government that the proposed rates comply with the federal reimbursement standard. Such a requirement involves little intrusion upon the state's ratesetting discretion, for rather than substituting the Court's judgment for that of the state agency or embroiling the Court in the ratemaking process, it leaves the state free to choose its own methods and procedures for determining appropriate reimbursement rates subject to the require-

ments of federal law. Likewise, the Court is convinced that Defendants will suffer no major injury as a result of the second part of the injunction, which requires Defendants to use the old rate structure until they have devised a plan that conforms to federal law. This part of the injunction is narrowly drawn, tailored to prevent irreparable injury to Plaintiffs and the class that the Court has conditionally certified while leaving intact the balance of the rate system. As noted above, restoration of the old rates affects only a few facilities for a limited period of time.[31] Compared with the serious and irreparable harm Plaintiffs are likely to suffer if injunctive relief is denied, the adverse consequences the state will suffer if the injunction issues are minimal.

■ Federal law clearly expresses a public policy that states should have maximum flexibility and discretion in ICF–MR ratesetting to eliminate waste, combat inflation, promote efficiency and preserve scarce public resources. But those interests must give way to the paramount public interest expressed in the substantive federal statutory limitation on state action that reimbursement rates must be "adequate and reasonable" and the procedural requirement of administrative law that agency action must be informed and principled. It is contrary to federal policy for states to make arbitrary reductions in reimbursement rates that have an adverse effect on the quality of care of Medicaid recipients; Defendants have no legitimate interest in decisionmaking that is arbitrary and insensitive to substantive federal standards. While a state is free to decide whether to participate in the Medicaid program and receive federal assistance, once the state opts into the Medicaid program it must comply with the strictures of federal law. *See, e.g., Harris v. McRae,* 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980). The injunctive relief granted by this Court serves the public interest by requiring Defendants to live up to the responsibilities with which they are charged under federal law without usurping their role in the ratesetting process.

In summary, the Court has found that Plaintiffs have demonstrated a substantial likelihood of success on the merits of their claim that the manner in which Defendants adopted the current Texas ICF–MR reimbursement rate structure was arbitrary, capricious and inconsistent with federal law; that a substantial threat exists that Plaintiffs and other residents of children's ICF–MR facilities will suffer irreparable harm if injunctive relief is not granted; that the threatened injury to Plaintiffs outweighs the harm that the injunction will cause Defendants; and that the granting of the injunction will not disserve the public interest. Based upon these findings, and in the exercise of the Court's discretion, the Court concludes that a preliminary injunction should issue requiring Defendants to develop and implement an ICF–MR reimbursement rate structure that complies with federal law and, until such a plan is implemented, to restore reimbursement rates for those children's ICF–MR facilities whose reimbursement rates were reduced by the current reimbursement rate structure to the level at which they stood immediately prior to the effective date of the current rate scheme. As stated above, this narrowly tailored injunction prevents irreparable harm to Plaintiffs and their class without disturbing the remainder of the state's reimbursement plan, and requires Defendants to fulfill their duties under federal law without encroaching upon Defendants' proper role in the ratesetting process.

The attached order is entered in accordance with this memorandum opinion.

### ORDER

In accordance with the Memorandum Opinion entered herein this date, it is ORDERED, ADJUDGED, and DECREED that:

---

**31.** Indeed, the record indicates that because current reimbursement rates for state schools are higher than the old rates for the community based children's facilities, state school placement for any particular child affected by the injunction would be more expensive than continued community based placement under the terms of the order.

(1) Defendants and their officers, agents, servants and employees are hereby enjoined from continuing to implement the current Texas ICF–MR reimbursement rate structure with respect to all community based Levels V and VI ICF–MR facilities that (a) specialize in the care of children, and (b) experienced a reduction in reimbursement rates when the current rate structure went into effect, until such time as Defendants develop and implement a reimbursement rate plan for Texas ICF–MR facilities that complies with federal law; with respect to the above-identified facilities, Defendants are hereby ordered immediately to implement payment of reimbursement rates at the level at which the rates stood immediately prior to the effective date of the current reimbursement rate structure.

(2) Defendants shall develop and implement a plan for reimbursement of Texas ICF–MR facilities that complies with federal law; prior to implementing such plan, Defendants shall consider all factors relevant to the reasonableness and adequacy of proposed reimbursement rates to meet the cost of efficiently and economically operated facilities, shall make a finding in compliance with all statutory and regulatory requirements that the proposed rates are reasonable and adequate to meet the costs of efficiently and economically operated facilities, shall submit assurances to HCFA that they have made such a finding, and shall receive HCFA approval of the plan.[32]

APPENDIX A

*Part I*

The current Texas structure for ICF–MR reimbursement rates, as published in the Texas Register, V. 6, No. 62, August 18, 1981, codified as TDHR Rule 326.35.99.200, provides, in pertinent part:

*.200. Reimbursement Methodology for Vendor Rates*

(a) General.  The Texas Department of Human Resources will reimburse Texas Medicaid long term care contracted providers for care rendered to recipients in the ICF–MR VI, ICF–MR V, and ICF–MR I levels of care.  Reimbursement rates are determined on a statewide basis using financial and statistical information from annual cost reports which must be submitted by each participating provider.

(1) Uniform rates.  Reimbursement rates are uniform statewide for the same class of service.

(2) Class of Service.  Service classes are based upon the level of care of the recipient and the type of provider.

(3) Rate period.  The rate period is the state fiscal year which is the annual period September 1 through August 31.

(4) Prospective rates.  Reimbursement rates are determined prospectively by projecting expenses reported on cost reports for a specific cost report year to the next ensuing rate period.

(5) Frequency of rate determination. Reimbursement rates are determined at least annually.

(b) Cost reporting.

(1) Cost reports.  Each provider must submit financial and statistical information at least annually in a cost report prescribed by the department.

\*        \*        \*        \*        \*        \*

(2) Desk verification of cost reports. Each cost report is desk verified to ensure that all financial and statistical information submitted in the cost report is in accordance with all applicable rules and instructions.  Cost report desk verifications are accomplished within six months of the date the cost report is received.  The desk verifica-

---

**32.**  Plaintiffs have challenged the current reimbursement rate structure on a number of grounds not treated by this opinion.  The Court suggests, but does not order, that while Defendants are in the process of reevaluating their rate structure, they should give attention to the unresolved issues raised by Plaintiffs and attempt to determine if they have any merit. Such a procedure might avoid needless litigation of some of those issues.

tion procedure includes the adjustment of reported costs to remove any unallowable costs which may be reported.

\* \* \* \* \* \*

(c) Cost-finding methodology. The cost-finding methodology recasts reported expense data in a consistent manner to determine per diem allowed costs. Certain adjustments are made in allowable costs in the cost-finding process to ensure that costs used for rate setting are costs required for long-term care; are costs derived from the marketplace; and are costs incurred from economic and efficient use of resources.

(1) Cost determined by cost area. Reported expenses are combined into four cost areas.

(A) Patient care cost area. The patient care cost area includes daily service expenses; laundry, linen, and housekeeping expense; activity services expense; social service expense; training expense; and consultant expense for direct patient care.

(B) Dietary care cost area. The dietary care cost area includes food and food service expense and dietary consultant expense.

(C) Facility cost-area. The facility cost area includes buildings, equipment, and capital expense; and, operation and maintenance expense.

(D) Administration cost area. The administration cost area includes all administrative expenses.

(2) Exclusion of certain reported expenses. Expenses included in cost-finding and reimbursement rate determination will be in accordance with provisions in the sections regarding allowable costs and unallowable costs found elsewhere in these rules.

(3) Adjustments to reported expenses.

(A) Non-Medicaid expenses removed.

\* \* \* \* \* \*

(4) Projected costs. Adjusted costs are projected from the various reporting periods for the same cost report year to the next ensuing rate period. Cost increase projections are performed so that substantively equitable treatment will be afforded all providers. Cost increase factors appropriate for each expense category are derived from the Bureau of Labor Statistics' consumer and producer price indices, the Bureau of Economic Analysis' implicit price deflators, the Fair Labor Standard Act's minimum wage provisions, the Social Security Administration's scheduled increases in Federal Insurance Contributions Act (FICA) amounts, and others.

(5) Projected cost arrays. Cost area per diem expense will be rank-ordered from low to high to produce projected per diem expense arrays.

(d) Rate-setting methodology. Reimbursement rates for each class of service are determined by selecting the projected per diem expense from each cost area within each class of service which corresponds with the 60th percentile Medicaid day of service, and summing the cost area amounts to arrive at per diem reimbursement rates.

(1) Classes of service.

(A) Level of care of recipient:

(i) ICF–MR VI;

(ii) ICF–MR V;

(iii) ICF–MR I.

(B) Provider Type.

(i) Type 1. State schools for the mentally retarded and state centers for human development.

(ii) Type 2. Community-based providers (this type includes all ICF–MR providers not included in provider type 1.)

(2) Reimbursement classes:

(A) ICF–MR VI/provider Type 1;

(B) ICF–MR VI/provider Type 2;

(C) ICF–MR V/provider Type 1;

(D) ICF–MR V/provider Type 2;

(E) ICF–MR V(sic)/provider Type 1;

(F) ICF–MR V(sic)/provider Type 2.

(3) Cost area projected arrays. Class rates are determined by selecting the 60th percentile Medicaid day of service per diem expense from projected cost arrays.

(A) Patient care cost area arrays:

(i) ICF–MR VI/provider Type 1;

(ii) ICF–MR VI/provider Type 2;

(iii) ICF–MR V/provider Type 1;

(iv) ICF–MR V/provider Type 2;

(v) ICF–MR I/provider Type 1;

(vi) ICF–MR I/provider Type 2;

(B) Dietary care cost area arrays:

(i) ICF–MR VI/provider Type 1;

(ii) ICF–MR VI/provider Type 2;

(iii) ICF–MR V/provider Type 1;

(iv) ICF–MR V/provider Type 2;

(v) ICF–MR I/provider Type 1;

(vi) ICF–MR I/provider Type 2.

(C) Facility cost area arrays:

(i) ICF–MR VI/provider Type 1;

(ii) ICF–MR VI/provider Type 2;

(iii) ICF–MR V/provider Type 1;

(iv) ICF–MR V/provider Type 2;

(v) ICF–MR I/provider Type 1;

(vi) ICF–MR I/provider Type 2.

(D) Administrative cost area arrays:

(i) ICF–MR VI/provider Type 1;

(ii) ICF–MR VI/provider Type 2;

(iii) ICF–MR V/provider Type 1;

(iv) ICF–MR V/provider Type 2;

(v) ICF–MR I/provider Type 1;

(vi) ICF–MR I/provider Type 2.

(4) Reimbursement rate determination for each reimbursement class. Each rate is determined by summing the four cost area amounts from within each reimbursement class selected from the cost area arrays.

(A) ICF–MR VI/provider Type 1:

(i) patient care cost area—provider Type 1;

(ii) dietary care cost area—provider Type 1;

(iii) facility cost area—provider Type 1;

(iv) administration cost area—provider Type 1;

(B) ICF–MR VI/provider Type 2:

(i) patient care cost area—provider Type 2;

(ii) dietary care cost area—provider Type 2;

(iii) facility cost area—provider Type 2;

(iv) administration cost area—provider Type 2;

(C) ICF–MR V/provider Type 1:

(i) patient care cost area—provider Type 1;

(ii) dietary care cost area—provider Type 1;

(iii) facility cost area—provider Type 1;

(iv) administration cost area—provider Type 1;

(D) ICF–MR V/provider Type 2:

(i) patient care cost area—provider Type 2;

(ii) dietary care cost area—provider Type 2;

(iii) facility cost area—provider Type 2;

(iv) administration cost area—provider Type 2;

(E) ICF–MR V(sic)/provider Type 1:

(i) patient care cost area—provider Type 1;

(ii) dietary care cost area—provider Type 1;

(iii) facility cost area—provider Type 1;

(iv) administration cost area—provider Type 1;

(F) ICF–MR V(sic)/provider Type 2:

(i) patient care cost area—provider Type 2;

(ii) dietary care cost area—provider Type 2;

(iii) facility cost area—provider Type 2;

(iv) administration cost area—provider Type 2.

(5) Exceptions to reimbursement rate determination. The reimbursement rate in each reimbursement class is lowered to the provider's customary charge, if the provider's customary charge is less than the Medicaid reimbursement rate for the same services.

(e) Appeals procedures. The Department of Human Resources will resolve all appeals in accordance with established administrative procedures.

*Part II*

TDHR's rules on allowable and unallowable costs, as published in the Texas Regis-

ter, V. 3, No. 82, November 3, 1978, codified as TDHR Rules 326.35.99.203 and .204, provide, in pertinent part:

*.203. Allowable Costs.*

(a) The following described items of expense are not intended to be exhaustive of all possible allowable costs. They are intended to serve only as a general guide. Detailed are many types of costs which can reasonably be anticipated to be incurred in a long-term care facility. The absence of a particular type of cost does not necessarily mean that it is not an allowable cost.

(b) Definitions.

   (1) Allowable costs are defined as "the types of expenses incurred in and by a long-term care facility which are directly or indirectly related to the provision of patient or resident care." Three tests are applied to determine whether or not an expenditure is an allowable cost. The first test is to determine if any portion of the amount spent was for personal or unrelated business activities of facility employees, owners, partners, officers, or stockholders, etc. If so, that portion of the amount must be removed. The second test is to determine whether the health, safety, and general well-being of the facility's patients or residents would be adversely affected if the expenditure was eliminated. If so, the expenditure is an allowable cost. The third test is whether or not the expenditure is on the list of unallowable costs. Allowable costs determined in this way are used in the cost-finding process to ascertain the costs facilities incur to provide care. This does not mean that the total amount of an allowable cost will be an allowed cost.

   (2) Allowed cost is defined as "all or part of an allowable cost which is considered to be reasonable and necessary in the provision of patient or resident care." Allowable costs which are determined to be excessive will be reduced to an amount that is reasonable and necessary. Allowed costs are used in the rate-determination process to set vendor reimbursement rates.

\*    \*    \*    \*    \*    \*

*.204. Unallowable Costs.*

(a) The following described items of expense are not intended to be exhaustive of all possible unallowable costs. Rather, they are intended to be a general guide to various unallowable costs which may be encountered in long-term care facilities. The absence of a particular type of cost does not necessarily mean that it is an allowable cost.

(b) Definitions.

   (1) Unallowable costs are defined as "the types of expenses incurred in and by a long-term care facility which are not directly or indirectly related to the provision of patient or resident care." Unallowable costs do not become a part of the cost-finding process to determine the costs facilities incur to provide care.

   (2) Unallowed cost is defined as "that part of an allowable cost which is not considered to be reasonable and necessary in the provision of patient or resident care." Unallowed cost will be removed from the costs used to set vendor reimbursement rates.